ACCEPTED
15-25-00111-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/2/2025 11:39 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/2/2025 11:39:12 PM
CHRISTOPHER A. PRINE
Clerk

CHASNOFF STRIBLING

BLAKE W. STRIBLING
BSTRIBLING@CHASNOFFSTRIBLING.COM
DIRECT 210.469.3225

DANIEL LECAVALIER | COUNSEL
DLECAVALIER@CHASNOFFSTRIBLING.COM
DIRECT 725.772.3815

July 2, 2025

Mr. Christopher A. Prine
Clerk, Texas Fifteenth Court of Appeals
P.O. Box 12852
Austin, Texas 78711

Re:    Court of Appeals No. 15-25-00110-CV; *Pleasanton Housing Finance Corporation, a Texas Nonprofit Corporation and Ismael Gallegos, Joey Macon, Mark Pinkston, Zachary Pawelek, Scott Ferguson, Lilian Cashmer, and Brandon Hicks, in Their Capacities as Board Members of Pleasanton Housing Finance Corporation v. City of Lake Worth, Texas*

Court of Appeals No. 15-25-00111-CV; *Pecos Housing Finance Corporation, Pleasanton Housing Finance Corporation, Maverick Housing Finance Corporation, and La Villa Housing Finance Corporation v. City of Arlington*

Court of Appeals No. 15-25-00113-CV; *Pleasanton Housing Finance Corporation and the Board Members of Pleasanton Housing Finance Corporation, In Their Official Capacities v. City of Missouri City, Texas & Sienna Parks & Levee Improvement District*

Dear Mr. Prine:

Jointly, Appellants Pleasanton Housing Finance Corporation, Maverick Housing Finance Corporation, and La Villa Housing Finance Corporation ("**Appellants**") provide the following response to this Court's June 25 letter inquiring into its jurisdiction over these appeals.

### A. Background

Appellants are housing finance corporations ("**HFCs**") established to coordinate and facilitate affordable housing for Texas residents, pursuant to the Housing Finance Corporation Act, Tex. Loc. Gov't Code § 394.001 *et seq*. ("**the Act**"). Appellants serve a "public purpose" and "perform[] an essential governmental function on behalf of and for the benefit of … this State." *Id.* at § 394.002(c)(1)-(3). To fulfill this purpose, HFCs enter into public-private real estate partnerships to facilitate the development of low-income housing within the "local government,"

and as a result, HFC-owned properties and the income derived therefrom are tax-exempt. *Id.* at § 394.903(a); 394.905.[1]

The orders challenged in these appeals resulted from efforts by four municipalities—Fort Worth, Lake Worth, Arlington, and Missouri City—to prevent Appellants and other so-called "traveling HFCs" from operating within these cities, a practice certain of the local governments describe as "a widespread problem across the state."[2] According to Appellees, the Act limits Appellants and other HFCs to operating only within the boundaries of the local governments that approve the incorporation of the HFC. Appellants assert that HFCs may operate outside the boundaries of their sponsoring governments under the unambiguous language of the Act. The trial court disagreed with Appellants, temporarily enjoining Appellants from purchasing or approving the purchase of real property within these cities' boundaries, or requesting, approving, or obtaining tax exemptions for any real property located within these cities' boundaries. These orders are before this Court.

Notably, these are just four among over a dozen similar lawsuits pending across the state, implicating the jurisdiction of numerous regional intermediate courts of appeal. *See*, *e.g.*, *City of Euless v. Cameron County Housing Finance Corp., Mark A. Yates, Gavino Sotelo, Eduardo Campirano, Louie Tijerina, and Cyndi Wyche, in their Official Capacities as Board Members of the Cameron County Housing Finance Corp., and Tarrant Appraisal District*, **Cause No. 348-365230-25**, pending in the 236th Judicial District of Tarrant County; *Harris County Municipal Utility Dist. No. 390 v. Pleasonton Housing Finance Corp. and Roland Altinger, in his Official Capacity as Chief Appraiser of the Harris Central Appraisal District*, **Cause No. 2025-33133**, pending in the 165th Judicial District of Harris County; *City of San Marcos and Hays County, Texas v. Pecos Housing Finance Corp. and Pleasonton Housing Finance Corp.*, **Cause No. 25-1185-DCB**, pending in the 207th Judicial District of Hays County; *Williamson County, Siena Municipal Utility Dist. No. 1 and Siena Municipal Utility Dist. No. 2 v. Cameron County Housing Finance Corp.*, **Cause No. 25-0488-C425**, pending in the 425th Judicial District of Williamson County; *City of Missouri City, Texas v. Maverick County Housing Finance Corp. and the Board Members of the Maverick County Housing Finance Corp. in their Official Capacities*, **Cause No.**

---

[1] On May 28, 2025, Gov. Greg Abbott signed HB 21 into law, amending the Act effective immediately. *See* Housing Finance Corporations; Authorizing a Fee, 2025 Tex. Sess. Law Serv. Ch. 208 (H.B. 21) (VERNON'S), attached hereto as Exhibit A. The properties at issue in these appeals were acquired prior to these amendments.

[2] *See Plaintiff City of Arlington's Third Amended Petition and Application for TRO and Injunctive Relief*, at 5 (Exhibit B); *City of Fort Worth's Third Amended Petition in Intervention and its Application for a Temporary Restraining Order and Injunctive Relief*, at 7 (Exhibit C); *[City of Lake Worth's] First Amended Application for Temporary Injunction and Response to Defendant Tarrant County Appraisal District's Plea to the Jurisdiction* (Exhibit D) at 8 (excluding exhibits attached thereto); *[City of Missouri City & Sienna Parks & Levee Improvement District's] First Amended Petition Requesting Declaratory and Injunctive Relief* (Exhibit E) at 9.

**25-DCV-325392**, pending in the 268th Judicial District of Fort Bend County; *City of Lewisville v. Cameron County Housing Finance Corp., Pecos Housing Finance Corp., and Don Spencer, in his Official Capacity as Chief Appraiser of the Denton County Tax Appraisal Dist.*, **Cause No. 25-4665-367**, pending in the 367th Judicial District of Denton County, Texas; *Town of Little Elm v. Pleasonton HFC, Pecos HFC, Don Spencer in is Official Capacity as Chief Appraiser of Denton County Appraisal District*, **Cause No. 25-5634-367**, pending in the 367th Judicial District of Denton County; *City of Carrollton v. Pecos Housing Finance Corp., Shane Docherty, in his Official Capacity as Chief Appraiser of the Dallas Central Appraisal Dist.*, **Cause No. DC-25-07935**, pending in the 101st Judicial District of Dallas County; *City of Rowlett and Garland Indep. Sch. Dist. v. Pleasonton Housing Finance Corp.*, **Cause No. DC-25-077781**, pending in the 191st Judicial District of Dallas County; *Montgomery County Municipal Utility Dist. No. 46 v. Maverick County Housing Finance Corp.*, **Cause No. 25-06-09304**, pending in the 284th Judicial District of Montgomery County.

### B. These appeals are brought by or against the state or a board, commission, department, office, or other agency in the executive branch of the state government.

The Fifteenth Court of Appeals has exclusive intermediate appellate jurisdiction over civil matters "brought by or against the state or a board, commission, department, office, or other agency in the executive branch of the state government[.]" Tex. Gov't Code § 22.220(d)(1).

The Texas Supreme Court recently addressed the scope of this provision in *Baumgardner v. Brazos River Auth.*, 2025 WL 1779081 *1 (Tex. June 27, 2025). Finding the river authority to be a political subdivision[3] rather than a state agency, the Court determined the appeal did not fall within this Court's exclusive jurisdiction. *Id.* at *3-5. Key to the Court's holding was the limited geographic reach of the river authority. *Id.* at *3, 5. Citing *Monsanto Co. v. Cornerstones Mun. Util. Dist.*, 865 S.W.2d 937, 940 (Tex. 1993), the Court observed "[a] political subdivision has jurisdiction over a portion of the State; a department, board or agency of the State exercises its jurisdiction throughout the State." *Baumgardner*, 2025 WL 1779081 *5. Although HFCs are created by local government, Tex. Loc. Gov't Code § 394.002(d), at all times relevant to these appeals there was no limit to the geographic reach of their operations. *See also* Tex. Gov't Code § 394.002(b)(1) ("the creation of a housing finance corporation is for the benefit of the people of the state, …"). Moreover, HFCs are empowered to delegate to the Texas Department of Housing and Community Affairs (indisputably a state agency) the authority to act on its behalf in the financing, refinancing, acquisition, leasing, ownership, improvement, and disposal of home mortgages or residential developments, making HFCs more akin to a state agency than a political subdivision. *Id.* at § 394.032(e).

---

[3] Although considered political subdivisions, this Court has exercised jurisdiction over appeals brought by or against municipalities. *See*, *e.g.*, *City of Austin v. Mario Ponce et al.*, Case No. 15-24-00076; *City of Rio Vista v. Johnson County Special Utility District*, Case No. 15-24-00065-CV.

**C. This Court has jurisdiction to consider these appeals "as provided by law."**

This Court also has jurisdiction over any other matter as provided by law. Tex. Gov't Code § 22.220(d)(2). As the Texas Supreme Court made clear in *In re Dallas Cnty.*, 697 S.W.3d 142, 146 (Tex. 2024) and *Kelley v. Homminga*, 706 S.W.3d 829, 834 (Tex. 2025), this Court was created to adjudicate matters that implicate, or that the Legislature has defined as critical to, the State's interests. The Legislature was clear on the importance of HFCs to achieving the goal of providing low-income housing to Texans: "the corporation, as a public instrumentality and nonprofit corporation, performs an <u>essential government function</u> on behalf of and for the benefit of the general public, the local government, and <u>this state</u>." Tex. Loc. Gov't Code § 394.002(c)(3) (emphasis added). There can be no question that Appellants' alleged "misuse and abuse" of the Texas Housing Finance Corporation Act is a matter that is critical to the State's interests within the common-law holding of *Kelley*. *See* Exhs. B-D.

Moreover, as noted *supra*, similar lawsuits are pending across the state. Those appeals should be heard by the same intermediate court of appeals as a matter of judicial economy. This, too, was a justification for the establishment of this Court: "[u]nder the current judicial system, appeals in cases of statewide significance are decided by one of Texas's 14 intermediate appellate courts. These courts have varying levels of experience with the complex legal issues involved in cases of statewide significance, resulting in <u>inconsistent results for litigants</u>. … The justices on this new Fifteenth Court of Appeals are elected statewide, ensuring that all Texans have a voice in the selection of judges who decide cases of statewide importance." *See* Senate Research Center, Bill Analysis, Tex. S.B. 1045, 88th Leg., R.S. (2023) (discussing background of the bill) (emphasis added).

**D. These appeals are matters in which a party to the proceeding has challenged the constitutionality of a state statute.**

Finally, this Court also has jurisdiction over matters in which a party to the proceeding files a petition, motion, or other pleading challenging the constitutionality or validity of a state statute or rule and the attorney general is a party to the case. Tex. Gov't Code § 22.220(d)(2).

Appellee City of Fort Worth has alleged that, to the extent Appellants' actions are authorized by the Act, the Act violates Article VIII Section 11 of the Texas Constitution. *See* <u>Exhibit C</u> at 9. It also seeks a declaratory judgment that Article VIII, Section 11 of the Texas Constitution "limits counties' ad valorem taxation authority to 'property within their respective boundaries' and that Defendants' scheme violates Constitutional limits on the scope of Texas counties' taxing authority." *Id.* at 9-10. Likewise, Appellee City of Lake Worth seeks a declaration from the Court that "Pleasanton HFC's actions violate the Texas Constitution's rules against extra-jurisdictional taxation by seeking to impose a system of taxation on properties located outside the boundaries of Atascosa County, Texas where City of Pleasanton is located." *See* <u>Exhibit D</u> at 12.

Appellants anticipate filing a notice with the Office of the Attorney General of these challenges under and pursuant to the Texas Constitution.

Thank you for your attention to this matter.

Respectfully Submitted:

/s/ Blake W. Stribling
Blake W. Stribling
Texas Bar No. 24070691
bstribling@chasnoffstribling.com
Daniel J. Lecavalier
Texas Bar No. 24129028
dlecavalier@chasnoffstribling.com
CHASNOFF STRIBLING, LLP
1020 N.E. Loop 410, Suite 150
San Antonio, Texas 78209
Telephone: (210) 469-4155
**ATTORNEYS FOR APPELLANTS
PLEASANTON HOUSING FINANCE
CORPORATION AND MAVERICK HOUSING
FINANCE CORPORATION**

*/s/ Roel Gutierrez*
Roel Gutierrez
Texas Bar No. 240693842
LAW OFFICE OF ROEL GUTIERREZ, PLLC
4415 N. McColl Rd.
McCallen, TX 78504
Telephone: 956-278-3529
Fax: 956-278-3530
roelgutierrezlaw@gmail.com
and
Robert J. Salinas
Texas Bar No. 17536000
2101 Wood Ave.
Donna, Texas 78537
Telephone: 956-464-2460
**ATTORNEYS FOR APPELLANT LA VILLA
HOUSING FINANCE CORPORATION**

**<u>Certificate of Service</u>**

I certify that a true and correct copy of the foregoing has been served in compliance with the Texas Rules of Civil Procedure on this 2nd day of July, 2025.

_____
Blake W. Stribling

# EXHIBIT A

2025 Tex. Sess. Law Serv. Ch. 208 (H.B. 21) (VERNON'S)

VERNON'S TEXAS SESSION LAW SERVICE 2025

Eighty-Ninth Legislature, 2025 Regular Session

Additions are indicated by **Text**; deletions by Text .
Vetoes are indicated by Text ;
stricken material by Text .

CHAPTER 208

H.B. No. 21

HOUSING FINANCE CORPORATIONS; AUTHORIZING A FEE

AN ACT
relating to housing finance corporations; authorizing a fee.

Be it enacted by the Legislature of the State of Texas:

SECTION 1. Section 394.004, Local Government Code, is amended to read as follows:

<< TX LOCAL GOVT § 394.004 >>

Sec. 394.004. APPLICATION OF CHAPTER TO CERTAIN RESIDENTIAL DEVELOPMENTS. This chapter applies only to a residential development at least 90 percent of which is for use by or is intended to be occupied by **households** [persons ] of low and moderate income whose adjusted gross income [, together with the adjusted gross income of all persons who intend to reside with those persons in one dwelling unit, ] did not for the preceding tax year exceed the maximum amount constituting moderate income **as defined** under the housing finance corporation's rules, resolutions relating to the issuance of bonds, or financing documents relating to the issuance of bonds.

SECTION 2. Subchapter A, Chapter 394, Local Government Code, is amended by adding Section 394.0045 to read as follows:

<< TX LOCAL GOVT § 394.0045 >>

**Sec. 394.0045. APPLICABILITY OF OPEN MEETINGS AND OPEN RECORDS LAWS. (a) Chapter 551, Government Code, applies to actions and proceedings under this chapter.**

**(b) Chapter 552, Government Code, applies to all records of a housing finance corporation.**

SECTION 3. The heading to Section 394.031, Local Government Code, is amended to read as follows:

<< TX LOCAL GOVT § 394.031 hd. >>

Sec. 394.031. EXERCISE OF POWERS**; AREA OF OPERATION**.

SECTION 4. Section 394.031, Local Government Code, is amended by adding Subsections (c), (d), and (e) to read as follows:

<< TX LOCAL GOVT § 394.031 >>

(c) Subject to Subsection (d), the area in which a housing finance corporation may own real property for residential development or engage in residential development is limited to:

(1) for a housing finance corporation sponsored by a municipality under Section 394.011, the boundaries of the municipality that sponsored the corporation;

(2) for a housing finance corporation sponsored by a county under Section 394.011, the boundaries of the county that sponsored the corporation; or

(3) for a housing finance corporation sponsored by more than one local government under Section 394.012:

(A) the boundaries of each municipal sponsor of the corporation; and

(B) the boundaries of each county sponsor of the corporation.

(d) A housing finance corporation may own real property for residential development or engage in residential development outside an area described by Subsection (c) only if a resolution or order, as applicable, approving that ownership or development in the outside area is adopted by the governing bodies of:

(1) each municipality that contains any part of the outside area in which the corporation proposes to own real property for residential development or engage in residential development;

(2) for a residential development or home located in the unincorporated area of a county, each county that contains any part of the outside area in which the corporation proposes to own real property for residential development or engage in residential development; and

(3) any housing finance corporation sponsored by a municipality or county described by Subdivision (1) or (2), as applicable.

(e) This section does not prohibit or limit a housing finance corporation from owning real property outside an area described by Subsection (c) or (d) if the property is not owned for purposes of residential development.

SECTION 5. Section 394.032(e), Local Government Code, is amended to read as follows:

<< TX LOCAL GOVT § 394.032 >>

(e) A housing finance corporation may delegate to the Texas Department of Housing and Community Affairs the authority to act on its behalf in the financing, refinancing, acquisition, leasing, ownership, improvement, and disposal of home mortgages or residential developments, [within and outside the jurisdiction of the housing finance corporation, ] including its authority to issue bonds for those purposes.

SECTION 6. Section 394.037, Local Government Code, is amended by adding Subsection (a–1) to read as follows:

<< TX LOCAL GOVT § 394.037 >>

(a–1) A housing finance corporation may issue bonds under this chapter for a purpose described by Subsection (a) only to finance or support a residential development or home that is located or will be constructed:

(1) within the boundaries of a local government in which a housing finance corporation is permitted to own real property for residential development or engage in residential development under Section 394.031(c); or

**(2) outside the boundaries of a local government described by Subdivision (1) if a resolution or order, as applicable, approving the issuance of bonds is adopted by the governing body of:**

**(A) each municipality that contains any part of the residential development or home; and**

**(B) for a residential development or home located in the unincorporated area of a county, each county that contains any part of the residential development or home.**

SECTION 7. Section 394.039, Local Government Code, is amended to read as follows:

<< TX LOCAL GOVT § 394.039 >>

Sec. 394.039. SPECIFIC POWERS RELATING TO FINANCIAL AND PROPERTY TRANSACTIONS. **Subject to Sections 394.031(c), (d), and (e), a** [A ] housing finance corporation may:

(1) lend money for its corporate purposes, invest and reinvest its funds, and take and hold real or personal property as security for the payment of the loaned or invested funds;

(2) mortgage, pledge, or grant security interests in any residential development, home mortgage, note, or other property in favor of the holders of bonds issued for those items;

(3) purchase, receive, lease, or otherwise acquire, own, hold, improve, use, or deal in and with real or personal property or interests in that property, [wherever the property is located, ] as required by the purposes of the corporation or as donated to the corporation; and

(4) sell, convey, mortgage, pledge, lease, exchange, transfer, and otherwise dispose of all or part of its property and assets.

SECTION 8. Section 394.9025, Local Government Code, is amended to read as follows:

<< TX LOCAL GOVT § 394.9025 >>

Sec. 394.9025. MULTIFAMILY RESIDENTIAL DEVELOPMENT. (a) Following a public hearing **by the governing body of the applicable local government**, a housing finance corporation may**, subject to the geographic limitations of Section 394.037(a–1),** issue bonds to finance a multifamily residential development to be owned by the housing finance corporation if**:**

**(1)** at least 50 percent of the units in the multifamily residential development are reserved for occupancy by individuals and families earning less than 80 percent of the area median family income**; or**

**(2) the units in the multifamily residential development are reserved in the manner provided by Section 394.9026(c)(1).**

(b) Following a public hearing by the governing body of the **applicable** local government, a housing finance corporation may**, subject to the geographic limitations of Section 394.037(a–1),** issue bonds to finance a multifamily residential development to be owned by the housing finance corporation in accordance with Section 394.004 if the housing finance corporation receives approval of the governing body of the local government.

SECTION 9. Subchapter Z, Chapter 394, Local Government Code, is amended by adding Sections 394.9026 and 394.9027 to read as follows:

<< TX LOCAL GOVT § 394.9026 >>

**Sec. 394.9026. ADDITIONAL CONDITIONS FOR BENEFICIAL AD VALOREM TAX TREATMENT RELATING TO CERTAIN MULTIFAMILY RESIDENTIAL DEVELOPMENTS. (a) In this section:**

(1) "Housing choice voucher program" means the housing choice voucher program under Section 8, United States Housing Act of 1937 (42 U.S.C. Section 1437f).

(2) "Housing finance corporation user" means:

(A) a housing finance corporation; or

(B) for a multifamily residential development that is not owned directly by a housing finance corporation, a public-private partnership entity or a developer or other person or entity that has an ownership interest or a leasehold or other possessory interest in multifamily residential development financed or supported by a housing finance corporation.

(3) "Lower income housing unit" means a residential unit reserved for occupancy by an individual or family earning not more than 60 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development.

(4) "Maximum market rent" means, with respect to a particular income-restricted unit, the average annual rent charged for all non-income-restricted units in the development having the same or substantially similar floor plan as the income-restricted unit.

(5) "Middle income housing unit" means a residential unit reserved for occupancy by an individual or family earning not more than 100 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development.

(6) "Moderate income housing unit" means a residential unit reserved for occupancy by an individual or family earning not more than 80 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development.

(7) "Multifamily residential development" means any residential development consisting of four or more residential units intended for occupancy as rentals, regardless of whether the units are attached or detached.

(8) "Rent" means any recurring fee or charge a tenant is required to pay as a condition of occupancy, including a fee or charge for the use of a common area or facility reasonably associated with residential rental property. The term does not include fees and charges for services or amenities that are optional for a tenant, such as pet fees and fees for storage or covered parking.

(9) "Rent reduction" means the projected difference between the rent charged for an income-restricted unit and the maximum market rent that could be charged for that same unit without the income restrictions.

(10) "Very low income housing unit" means a residential unit reserved for occupancy by an individual or family earning not more than 50 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development.

(b) This section does not apply to a multifamily residential development that is the recipient of a low income housing tax credit allocated under Subchapter DD, Chapter 2306, Government Code.

(c) Subject to Subsection (g), an ad valorem tax exemption under Section 394.905 for a multifamily residential development owned by a housing finance corporation is available only if the other requirements of this chapter are satisfied and if:

(1) at least:

    (A) 10 percent of the units in the development are reserved for occupancy as lower income housing units and at least 40 percent of the units in the development are reserved for occupancy as moderate income housing units; or

    (B) 10 percent of the units in the development are reserved for occupancy as very low income housing units and at least 40 percent of the units in the development are reserved for occupancy as middle income housing units;

(2) the rent reduction at the development in the preceding tax year was:

    (A) not less than 50 percent of the amount of the estimated ad valorem taxes that would have been imposed on the applicable property in the same preceding tax year if the property did not receive an exemption from those taxes under Section 394.905, beginning with:

        (i) for a multifamily residential development that is acquired by the corporation, the first tax year after the tax year that the corporation acquires the development; and

        (ii) for a newly constructed multifamily residential development not described by Subparagraph (i), the first tax year after the tax year in which construction first begins on the development; or

    (B) less than 50 percent of the amount of the estimated ad valorem taxes described by Paragraph (A) beginning with the tax year specified by that paragraph, but the housing finance corporation user paid to each taxing unit authorized to impose ad valorem taxes on the applicable property for the applicable tax year an amount equal to that taxing unit's pro rata share of the rent reduction shortfall that exists based on the difference between the minimum rent reduction amount described by Paragraph (A) and the amount of actual rent reduction at the development in the preceding tax year;

(3) the income-restricted residential units in the development have the same unit finishes and equipment and access to community amenities and programs as residential units that are not income-restricted;

(4) the percentage of very low, lower, moderate, and middle income housing units reserved in each category of income-restricted residential units in the development, based on the number of bedrooms per unit, is the same as the percentage of each category of income-restricted residential units reserved in the development as a whole;

(5) the monthly rent charged per unit does not exceed:

    (A) for a very low income housing unit, 30 percent of 50 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development;

    (B) for a lower income housing unit, 30 percent of 60 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development;

    (C) for a moderate income housing unit, 30 percent of 80 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development; or

    (D) for a middle income housing unit, 30 percent of 100 percent of the area median income, adjusted for family size, as defined by the United States Department of Housing and Urban Development;

(6) the housing finance corporation user and the development do not:

    (A) refuse to rent a residential unit in the development to an individual or family because the individual or family participates in the housing choice voucher program; or

(B) use a financial or minimum income standard that requires an individual or family participating in the housing choice voucher program to have a monthly income of more than 250 percent of the individual's or family's share of the total monthly rent payable for a unit;

(7) the housing finance corporation user causes to be published on the Internet website of the development information about the development's policies regarding tenant participation in the housing choice voucher program;

(8) the housing finance corporation user for the development:

(A) affirmatively markets available residential units directly to individuals and families participating in the housing choice voucher program; and

(B) notifies local housing authorities of the development's acceptance of tenants in the housing choice voucher program; and

(9) each lease agreement for an income-restricted residential unit in the development provides that:

(A) the landlord may not retaliate against the tenant or the tenant's guests by taking an action because the tenant established, attempted to establish, or participated in a tenant organization;

(B) the landlord may only choose to not renew the lease if the tenant:

(i) committed one or more substantial violations of the lease;

(ii) failed to provide required information on the income, composition, or eligibility of the tenant's household; or

(iii) committed repeated minor violations of the lease that disrupt the livability of the property, adversely affect the health and safety of any person or the right to quiet enjoyment of the leased premises and related development facilities, interfere with the management of the development, or have an adverse financial effect on the development, including the failure of the tenant to pay rent in a timely manner; and

(C) to not renew the lease, the landlord must serve a written notice of proposed nonrenewal on the tenant not later than the 30th day before the effective date of nonrenewal.

(d) In calculating the income of an individual or family for a very low, lower, moderate, or middle income housing unit, the housing finance corporation user must use the definition of annual income described in 24 C.F.R. Section 5.609, as implemented by the United States Department of Housing and Urban Development. If the income of a tenant exceeds an applicable limit at the time of the renewal of a lease agreement for a residential unit, the provisions of Section 42(g)(2)(D), Internal Revenue Code of 1986, apply in determining whether the unit may still qualify as a very low, lower, moderate, or middle income housing unit.

(e) A housing finance corporation user may require an individual or family participating in the housing choice voucher program to pay the difference between the monthly rent for the applicable unit and the amount of the monthly voucher if the amount of the voucher is less than the rent.

(f) A tenant may not waive the protections provided by Subsection (c)(9). A housing finance corporation user may adopt tenant protections that are more protective of tenants than the tenant protections provided by Subsection (c)(9).

(g) A multifamily residential development that is acquired by a housing finance corporation and is occupied on the date of the acquisition is eligible for an ad valorem exemption under Section 394.905 for the two tax years following the date of the acquisition, regardless of whether the development complies with the conditions prescribed by Subsections (c)(1),

(3), (4), and (5), if the development comes into compliance with Subsections (c)(1), (3), (4), and (5) not later than the end of the second tax year after the date of the acquisition.

<< TX LOCAL GOVT § 394.9027 >>

Sec. 394.9027. AUDIT REQUIREMENTS FOR CERTAIN MULTIFAMILY RESIDENTIAL DEVELOPMENTS. (a) In this section:

(1) "Department" means the Texas Department of Housing and Community Affairs.

(2) "Housing finance corporation user" has the meaning assigned by Section 394.9026.

(b) A housing finance corporation or housing finance corporation user that claims an ad valorem tax exemption for a multifamily residential development under Section 394.905 must annually submit to the department an audit report for a compliance audit, prepared at the expense of the housing finance corporation user and conducted by an independent auditor or compliance expert with an established history of providing similar audits on housing compliance matters, that:

(1) states whether the corporation is in compliance with the requirements imposed for the exemption by Section 394.9026; and

(2) identifies the difference in the rent charged for income-restricted residential units and the estimated maximum market rents that could be charged for those units without the income restrictions.

(c) Not later than the 60th day after the date of receipt of the audit conducted under Subsection (b), the department shall examine the audit report and publish a report summarizing the findings of the audit. The report must:

(1) be made available on the department's Internet website;

(2) be issued to the housing finance corporation that owns or is associated with the development that is the subject of an audit, the housing finance corporation user of the development, the comptroller, and the governing body of the sponsoring local government or governments of the housing finance corporation; and

(3) describe in detail the nature of any failure to comply with the requirements of Section 394.9026.

(d) If an audit report submitted under Subsection (b) indicates noncompliance with Section 394.9026, a housing finance corporation user, the associated housing finance corporation, and the chief appraiser of the appraisal district in which the development is located must be given written notice from the department that is provided not later than the 120th day after the date a report has been submitted under Subsection (b) and specifies the reasons for noncompliance. For a finding of noncompliance with any provision of Section 394.9026(c), a housing finance corporation user and the associated housing finance corporation must be given:

(1) additional written notice that:

(A) otherwise complies with the notice requirements of this section;

(B) contains at least one option for a corrective action to resolve the noncompliance; and

(C) informs the housing finance corporation user and associated housing finance corporation that failure to resolve the noncompliance within the period provided by Subdivision (2) will result in the loss of the ad valorem tax exemption under Section 394.905;

(2) a period of 180 days after the date notice is received under Subdivision (1) to resolve the matter that is the subject of the notice; and

(3) if a matter that is the subject of a notice provided under this subdivision is not resolved to the satisfaction of the department during the period provided by Subdivision (2), a second notice that informs the housing finance corporation of the loss of the ad valorem tax exemption for the development due to noncompliance with Section 394.9026.

(e) The initial audit report required by Subsection (b) is due not later than June 1 of the tax year following:

(1) the date of acquisition for an existing multifamily residential development that is acquired by a housing finance corporation; or

(2) the date a newly constructed multifamily residential development first becomes occupied by one or more tenants.

(f) Subsequent audit reports following the issuance of the initial audit report under Subsection (e) are due not later than June 1 of each year.

(g) The department may extend the deadline for submitting any audit required under this section for good cause shown, as determined by the department.

(h) An independent auditor or compliance expert may not prepare an audit under Subsection (b) for more than three consecutive tax years for the same housing finance corporation. After the third consecutive audit, the independent auditor or compliance expert may prepare an audit only after the second anniversary of the preparation of the third consecutive audit.

(i) The department:

(1) shall adopt forms and reporting standards for the auditing process;

(2) may charge a fee for the submission of an audit report under this section in a reasonable amount necessary to cover the expenses of administering this section; and

(3) shall adopt rules necessary to implement this section and Section 394.9026.

(j) Rules adopted under Subsection (i)(3) must include administrative processes and a process by which a housing finance corporation user may appeal a finding of noncompliance made under this section or a loss of a tax exemption due to a finding of noncompliance with Section 394.9026 or any other provision of this chapter.

(k) An audit conducted under Subsection (b) is subject to disclosure under Chapter 552, Government Code, except that information containing tenant names, unit numbers, or other tenant identifying information may be redacted.

(*l*) This section does not apply to a multifamily residential development during any period that the development is the recipient of a low income housing tax credit allocated under Subchapter DD, Chapter 2306, Government Code.

SECTION 10. Section 394.903, Local Government Code, is amended to read as follows:

<< TX LOCAL GOVT § 394.903 >>

Sec. 394.903. **TRANSFER** [LOCATION ] OF [RESIDENTIAL DEVELOPMENT; ] RESIDENTIAL DEVELOPMENT SITES. **Subject to Sections 394.031(c) and (d), a** [(a) A residential development covered by this chapter must be located within the local government.

[(b) The ] local government may transfer any residential development site to a housing finance corporation by sale or lease. The governing body of the local government may authorize the transfer by resolution without submitting the issue to the voters and without regard to the requirements, restrictions, limitations, or other provisions contained in any other general, special, or local law. [The site may be located wholly or partly inside or outside the local government. ]

SECTION 11. Section 394.905, Local Government Code, is amended to read as follows:

<< TX LOCAL GOVT § 394.905 >>

Sec. 394.905. EXEMPTION FROM **TAXES AND FEES** [TAXATION ]. **(a) Subject to compliance with the requirements of this chapter, a** [The ] housing finance corporation **and**[, ] all property owned by **the corporation** [it ], the income from **that** [the ] property, all bonds issued by **the corporation** [it ], the income from **those** [the ] bonds, and the transfer of **those** [the ] bonds are exempt, as public property used for public purposes, from license fees, recording fees, and all other taxes imposed by this state or any political subdivision of this state.

**(b) A multifamily residential development owned by a housing finance corporation is eligible for an exemption from ad valorem taxes, and the materials used to improve the applicable property are eligible for an exemption from sales and use taxes, only if:**

**(1) the property is located in an area in which the housing finance corporation is authorized to own real property or engage in residential development under Section 394.031(c) or (d);**

**(2) the board of directors of the corporation has adopted a resolution approving the multifamily residential development;**

**(3) before approval of the board of directors under Subdivision (2), the housing finance corporation or a sponsoring local government of the corporation:**

**(A) conducts, or obtains from a professional entity that has experience underwriting affordable residential developments and does not have a financial interest in the corporation or the applicable development, developer, or investors, an underwriting assessment of the proposed development that is dated not earlier than 180 days before the date of the board resolution;**

**(B) based on the underwriting assessment, makes a good faith determination that the total amount of annual rent reduction applicable to the development, as defined by Section 394.9026(a), will be not less than 50 percent of the amount of estimated ad valorem taxes that would be imposed on the property in the same tax year if the applicable property did not receive an exemption from those taxes under this section:**

**(i) for a development that is acquired by the corporation, each of the third, fourth, and fifth tax years after the tax year that the corporation acquires the development; and**

**(ii) for a newly constructed development not described by Subparagraph (i), each of the first, second, and third tax years after the tax year in which the development first achieves an occupancy rate of 90 percent; and**

**(C) publishes on its Internet website a copy of the underwriting assessment required by this subsection; and**

(4) the housing finance corporation submits to the Texas Department of Housing and Community Affairs and to the chief appraiser for each appraisal district in which the exemption is sought a one-time exemption application on a form promulgated by the comptroller.

(c) Notwithstanding Subsections (a) and (b), and subject to Section 394.9027, a multifamily residential development owned by a housing finance corporation or a housing finance corporation user is not entitled to an ad valorem tax exemption for any given tax year in which:

(1) the corporation or the housing finance corporation user is not in compliance with any provisions of Section 394.9026(c) and:

(A) the notice requirements in Section 394.9027(d) have been fulfilled; and

(B) the noncompliance is not resolved to the satisfaction of the department within the period provided by Section 394.9027(d)(2); or

(2) the corporation or the housing finance corporation user has not timely submitted the audit report required by Section 394.9027.

(d) Subsection (a) does not apply to ad valorem taxes imposed on a multifamily residential development by:

(1) a conservation or reclamation district created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, that provides water, sewer, or drainage service to the development, unless the applicable corporation has entered into a written agreement with the district to make a payment to the district in lieu of taxation, in the amount specified in the agreement; or

(2) an emergency services district created under Chapter 775, Health and Safety Code, unless the applicable corporation has entered into a written agreement with the district to make a payment to the district in lieu of taxation, in the amount specified in the agreement.

(e) Subsections (b)(3), (b)(4), and (c) do not apply to a multifamily residential development that is:

(1) owned by a housing finance corporation; and

(2) the recipient of a low income housing tax credit allocated under Subchapter DD, Chapter 2306, Government Code.

(f) The corporation is exempt from the franchise tax imposed by Chapter 171, Tax Code, only if the corporation is exempted by that chapter.

<< Repealed: TX LOCAL GOVT § 394.005 >>

SECTION 12. Section 394.005, Local Government Code, is repealed.

<< Note: TX LOCAL GOVT §§ 394.031, 394.903, 394.037, 394.9025, 394.905 >>

<< Note: TX LOCAL GOVT §§ 394.9026, 394.9027 >>

SECTION 13. (a) Subject to Subsection (i) of this section, Sections 394.031(c) and (d), Local Government Code, as added by this Act, and Section 394.903, Local Government Code, as amended by this Act, apply only to the ownership of real property that is acquired by a housing finance corporation on or after the effective date of this Act. The ownership of real property acquired by a housing finance corporation before the effective date of this Act, and the authority of a housing finance corporation to own

that property or to engage in residential development with respect to that real property in an area outside the areas authorized by Sections 394.031(c) and (d), Local Government Code, as added by this Act, are governed by the law in effect on the date the property was acquired by the housing finance corporation, and the former law is continued in effect for that purpose.

(b) Section 394.037(a–1), Local Government Code, as added by this Act, and Section 394.9025, Local Government Code, as amended by this Act, apply only to bonds issued on or after the effective date of this Act. Bonds issued before the effective date of this Act are governed by the law in effect on the date the bonds were issued, and the former law is continued in effect for that purpose.

(c) Section 394.9026, Local Government Code, as added by this Act, and Section 394.905, Local Government Code, as amended by this Act, apply only to a tax for a tax year that begins on or after the effective date of this Act.

(d) Subject to Subsections (e) and (f) of this section, Sections 394.9026 and 394.9027, Local Government Code, as added by this Act, apply to all multifamily residential developments claiming an exemption under Section 394.905, Local Government Code, regardless of when the developments were approved or acquired.

(e) A multifamily residential development that was acquired by a housing finance corporation before the effective date of this Act is not eligible for an exemption under Section 394.905, Local Government Code, as amended by this Act, unless the housing finance corporation that owns the development and any housing finance corporation user, as defined by Section 394.9026, Local Government Code, as added by this Act, associated with the development come into compliance:

(1) not later than January 1, 2026, with Sections 394.9026(c)(6), (7), (8), and (9), Local Government Code, as added by this Act; and

(2) with Sections 394.9026(c)(1), (2), (3), (4), and (5), Local Government Code, as added by this Act, not later than the earlier of:

(A) the end of the 10th tax year following the effective date of this Act; or

(B) the end of the first tax year following a tax year in which:

(i) existing mortgage indebtedness of the development is refinanced;

(ii) title to the development is conveyed; or

(iii) a sale, conveyance, transfer or assignment, or series of sales, conveyances, transfers or assignments, results in a change in a majority of the beneficial ownership interests of any housing finance corporation user associated with the development.

(f) Notwithstanding Section 394.9027(b) or (f), Local Government Code, as added by this Act, the initial audit report required to be submitted under Section 394.9027(b), Local Government Code, as added by this Act, for a multifamily residential development that was acquired by a housing finance corporation before the effective date of this Act must be submitted by the later of:

(1) the date established by Section 394.9027(e), Local Government Code, as added by this Act; or

(2) June 1, 2026.

(g) Subject to Subsections (e), (h), and (i) of this section, Section 394.905, Local Government Code, as amended by this Act, applies to all multifamily residential developments owned by a housing finance corporation, regardless of when the developments were approved or acquired.

(h) Sections 394.905(b)(1), (2), and (3) and (d), Local Government Code, as added by this Act, apply only to multifamily residential developments that are acquired by a housing finance corporation on or after the effective date of this Act.

(i) A residential development that is owned by a housing finance corporation on September 1, 2025, and is located outside an area in which the corporation is authorized to own real property or engage in residential development under Section 394.031(c), Local Government Code, as added by this Act, is not eligible for an ad valorem tax exemption under Section 394.905, Local Government Code, as amended by this Act, after January 1, 2027, unless the corporation obtains the appropriate resolutions or orders required under Section 394.031(d), Local Government Code, as added by this Act, before that date.

(j) Not later than January 1, 2026, the Texas Department of Housing and Community Affairs shall adopt rules necessary to implement Section 394.9027(i), Local Government Code, as added by this Act.

SECTION 14. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2025.

Passed by the House on May 10, 2025: Yeas 115, Nays 13, 3 present, not voting; passed by the Senate on May 14, 2025: Yeas 30, Nays 1.

Approved May 28, 2025.
Effective May 28, 2025.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

FILED
TARRANT COUNTY
6/2/2025 10:27 AM
THOMAS A. WILDER
DISTRICT CLERK

No. 348-363561-25

| | | |
|---|---|---|
| CITY OF ARLINGTON, | § | IN THE DISTRICT COURT |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| PECOS HOUSING FINANCE | § | |
| CORPORATION, a Texas nonprofit | § | |
| corporation; JOE DON BOBBITT, in his | § | 348TH JUDICIAL DISTRICT |
| official capacity as Chief Appraiser of the | § | |
| Tarrant Appraisal District, | § | |
| | § | |
| *Defendants*, | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF FORT WORTH, | § | |
| | § | |
| *Intervenor-Plaintiff*. | § | TARRANT COUNTY, TEXAS |
| | § | |

**PLAINTIFF CITY OF ARLINGTON'S
THIRD AMENDED PETITION AND APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF**

TO THE HONORABLE JUDGE MEGAN FAHEY:

In support of its Third Amended Petition and Application for a Temporary Restraining Order and Injunctive Relief, Plaintiff City of Arlington ("Arlington") alleges the following:

**I. INTRODUCTION**

1. This case concerns a misuse and abuse of the Texas Housing Finance Corporation Act, Tex. Local Gov't Code §§ 394.001 *et seq.* Arlington recently learned that the Pecos Housing Finance Corporation ("Pecos HFC"), the Pleasanton Housing Finance Corporation ("Pleasanton HFC"), and the La Villa Housing Finance Corporation ("La Villa HFC") (collectively, "Defendant HFCs") have been unlawfully removing Arlington-based properties from the tax appraisal rolls in exchange for monetary kickbacks, resulting in the loss of millions of dollars in real property value from the local tax base.

2. The Defendant HFCs' scheme seems to work like this: a private developer acquires

land for a new multifamily development (or acquires an already-existing development) in a city outside the HFC's local jurisdiction; the private developer then conveys that property to the HFC; the HFC, as the new owner, then applies for and receives a 100% tax exemption, and the property is removed from the tax rolls; the HFC then leases that now-exempt property to a private landlord (oftentimes the same developer who originally purchased the property), who then shares the profits with the HFC. The upshot of this scheme is that the developer and landlord get a massive tax exemption, the HFC gets to collect fees and a portion of the development's profits, and the other city (in this case, Arlington) bears 100% of the downside.

3.      In short, a handful of tiny public corporations, located hundreds of miles away in small towns with no connection to Arlington, have drastically reduced Arlington's yearly tax revenue by millions of dollars while they rake in undeserved fees and profits from Arlington-based rental properties. Arlington now asks this Court to halt the Defendant HFCs' unlawful behavior before they do any further irreversible damage to Arlington's tax base, and to stop the Chief Appraiser of the Tarrant Appraisal District from granting tax exemptions requested by the Defendant HFCs for any Arlington-based properties.

## II.      PARTIES

4.      Plaintiff City of Arlington is a home-rule municipality located in Tarrant County, Texas.

5.      Defendant Pecos HFC is a Texas nonprofit corporation. It may be served with citation through its registered agent, John Salcido, at 2320 Teague Dr., Pecos, Texas 79772, or wherever else he may be located.

6.      Defendant Pleasanton HFC is a Texas nonprofit corporation. It may be served with citation through its registered agent, Johnny Huizar, at 108 Second St., Pleasanton, Texas 78064, or wherever else he may be located.

7.      Defendant La Villa HFC is a Texas nonprofit corporation. It may be served with citation through its registered agent, Rosa Perez, at 916 South Mike Chapa Dr., La Villa, Texas 78562, or wherever else he may be located.

8.     Defendant Joe Don Bobbitt is the Chief Appraiser of the Tarrant Appraisal District. He is being sued in his official capacity only.

## III.     JURISDICTION, VENUE, AND DISCOVERY CONTROL PLAN

9.     This Court has jurisdiction over this matter because Plaintiff seeks relief within the jurisdictional limits of this Court. *See* Tex. Civ. Prac. & Rem. Code §§ 65.001 *et seq.*; Tex. Tax Code §§ 43.01, 43.03; Tex. R. Civ. P. 680.

10.     Venue is proper in Tarrant County because all (or at least a substantial part) of the events and actions giving rise to this case occurred in Tarrant County—and by conducting business in Tarrant County, the Defendant HFCs have purposely availed themselves to this venue. *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(1). This suit, moreover, concerns real property located in Tarrant County, making Tarrant County the mandatory venue for this case. *See id.* § 15.011.

11.     Venue is also proper pursuant to the Tax Code. The Tax Code provides that "[a] taxing unit," like Arlington, "may sue the appraisal district that appraises property for the unit to compel the appraisal district to comply with . . . applicable law." Tex. Tax Code § 43.01. And it further provides that, in such a suit, "[v]enue is in the county in which the appraisal district is established." *Id.* § 43.02. As such, because Arlington (a taxing unit) is suing the Tarrant Appraisal District, Tarrant County is the mandatory venue for this case. *Id.* Sections 43.01 and 43.03 of the Tax Code, moreover, waive any governmental immunity Defendant Bobbitt might have.

12.     Arlington intends to conduct discovery in this case under the Level 3 discovery control plan. *See* Tex. R. Civ. P. 190.4.

## IV.     BACKGROUND & RELEVANT LAW

### A.     The Texas Housing Finance Corporation Act.

13.     This suit concerns the Texas Housing Finance Corporation Act, Tex. Local Gov't Code §§ 394.001 *et seq.* ("the Act"). The Act was passed in 1979 to help facilitate the development of low-income housing. *See* Tex. Local Gov't Code § 394.002(a) (the Act's purpose is to "provide a means to finance the cost of residential ownership and development that will provide decent, safe, and sanitary housing at affordable prices for residents of local governments").

14.     To help create more low-income housing, the Act empowers local governments to create Housing Finance Corporations, or HFCs—nonprofit organizations, comprised of local officials, that help coordinate and facilitate affordable-housing projects. *See* Tex. Local Gov't Code §§ 394.002, 394.011(a), 394.032. And because HFCs are (at least in theory) furthering a public purpose, the Act provides that HFC-owned properties and the income derived from those properties are tax-exempt. *Id.* § 394.905 ("The housing finance corporation, all property owned by it, the income from the property, all bonds issued by it, the income from the bonds, and the transfer of the bonds are exempt, as public property used for public purposes, from license fees, recording fees, and all other taxes imposed by this state or any political subdivision of this state.").

15.     HFCs are commonly a part of public/private real estate partnerships, in which a private developer acquires land for a new development or acquires an existing multifamily project and then conveys it to an HFC, which then acquires tax-exempt status for the property and leases the property to a private landlord who, in turn, pays fees to the HFC and shares the profits generated by the property with the HFC.

16.     But because the Act allows for such an enormous tax benefit, it provides two specific restrictions on what residential developments an HFC can tax-exempt: (1) a residential development can receive tax exemption from an HFC only if at least 90% of the development "is for use by or is intended to be occupied by persons of low and moderate income," as defined by the statute, *id.* § 394.004; and (2) the residential development "must be located within the local government," *id.* § 394.903.

17.     An HFC, in other words, can tax-exempt a residential development only if the development is located within the HFC's local jurisdiction and is actually used to house low-income individuals. *See id.* §§ 394.004, 394.903.

**B.      Several faraway HFCs are unlawfully exempting properties in Arlington that do not house low-income residents.**

18.     Arlington recently learned that the Defendant HFCs have been ignoring these statutory restrictions and has been giving tax exemptions to large, multifamily housing

developments in Arlington without Arlington's knowledge, input, or approval. [Affidavit of Mindy Cochran, attached hereto as **Exhibit 1**, at ¶¶ 4–10.]

19.    The Defendant HFCs' unlawful tax-exemption scheme has removed tens of millions of dollars from Tarrant County taxing units' tax rolls and has caused Arlington to lose millions of dollars in annual tax revenue. [*Id.* at ¶ 10.]

20.    To illustrate, several months ago, Defendant Pecos HFC acquired the Zenith North Collins (735 Washington Dr.) apartment complex—an already-built, upscale apartment complex located next to a golf course in Arlington.[1] [*Id.* at ¶ 5.] After acquiring this complex, the Pecos HFC applied for and received a full tax exemption for this property. [*Id.*] And after receiving that exemption, it leased the complex to a private landlord and now collects a share of that complex's profits. [*Id.*] This property was appraised at $86 million. [*Id.*] So, when it was removed from the tax rolls, that caused the Tarrant County Appraisal District to lose $1.7 million in annual ad valorem tax revenue, and Arlington's share of that revenue was approximately $447,000. [*Id.*]

21.    In other words, by exempting just one apartment complex in Arlington, the Pecos HFC caused Arlington to lose roughly $447,000 in annual tax revenue, and there is no clear path for Arlington (or other affected local entities) to recoup that loss. [*See id.*]

22.    To make matters worse, the Zenith North Collins doesn't even provide low-income housing. With fees and rent, a three-bedroom apartment in this complex costs well over $3,000 per month, and a two-bedroom is around $2,000 per month.[2] And upon information and belief, this complex does not come close to meeting the 90%-low-income-housing threshold needed to receive an exemption under the Act. *See* Tex. Local Gov't Code § 394.004 (providing that a residential development can receive tax exemption from a HFC only if at least 90% of the development "is for use by or is intended to be occupied by persons of low and moderate income").

23.    This is a widespread problem across the state. The City of Euless, for example, has

---

[1]    At the time of acquisition, this complex was known as the "Jefferson North Collins" apartment complex.

[2]    https://www.zenitharlington.com/floorplans/.

seen at least a 2% drop in its overall annual revenue after a *single* apartment complex received tax-exempt status from the Cameron County HFC;[3] and Dallas, Fort Worth, McKinney, Irving, Lewisville, and other north Texas cities have reported millions of dollars in total lost tax revenue.[4] Worse, these out-of-jurisdiction HFCs are often bestowing tax-exempt status to already-built structures (not new projects), and many of the exempted properties aren't even affordable-housing projects; they are typical for-profit apartments and condos, usually located in upmarket neighborhoods, that do not offer reduced rent, housing vouchers, or other benefits to low-income applicants.[5]

24.     Upon information and belief, the Pecos HFC also recently bestowed tax-exempt status to another apartment complex in Arlington called Cedar Point (2020 Cedar Point Dr.). [Exhibit 1 at ¶ 6.] That property is appraised at approximately $27.5 million, and Arlington's lost ad valorem tax revenue because of this tax exemption amounts to about $165,000 per year. [*Id.*] That complex, similarly, does not offer affordable housing as contemplated by the Act.

25.     Arlington, moreover, has good reason to believe the Pecos HFC plans to close on several more Arlington-based properties in the coming months, and that it is on the verge of closing on one of those properties in the coming days. [*Id.* at ¶ 10; Affidavit of Molly Shortall, attached hereto as **Exhibit 2**, at ¶ 5.]

26.     Arlington also recently learned that the Pleasanton HFC and the La Villa HFC have been engaging in the same sort of unlawful tax-exemption scheme in Arlington. [Exhibit 1 at ¶¶ 4, 8–9.]

27.     The Pleasanton HFC has acquired at least two properties in Arlington: The Washington apartment complex (707 Washington Dr.) and Cedars and River Legacy Park (903 Ashford Ln.). [*Id.* at ¶ 8.] Upon information and belief, the Pleasanton HFC has applied for, but

---

[3]     Andrea Lucia, *Euless Loses 2 Percent of Revenue to Controversial Tax Break Approved in Faraway County*, CBS News (Feb. 21, 2024).

[4]     Andrea Lucia, *Housing Group Made Millions Getting Tax Breaks for Developers, Costing Cities and Schools Even More*, CBS News (Dec. 22, 2023).

[5]     *Id.* (documenting that an out-of-town HFC purchased an apartment complex in a "luxurious community" in Irving and that the tenants' rents went *up* significantly under the HFC's ownership).

has not yet received, tax exemptions for these properties. [*Id.*]

28. The Washington is appraised at approximately $34.5 million; if taken off the tax rolls, it would cause the Tarrant County Appraisal District to lose about $754,000 in annual ad valorem tax revenue, and Arlington's share of that lost revenue would be approximately $207,000 per year. [*Id.* at ¶ 8a.] Cedars and River Legacy Park is appraised at approximately $32.5 million; if taken off the tax rolls, it would cause the Tarrant County Appraisal District to lose about $710,000 in annual ad valorem tax revenue, and Arlington's share of that lost revenue would be approximately $195,000 per year. [*Id.* at ¶ 8b.]

29. In other words, if the Pleasanton HFC receives tax exemptions for these properties, it will likely cause Arlington to lose over $400,000 in annual ad valorem tax revenue. [*Id.* at ¶ 8.]

30. Arlington also recently learned that the La Villa HFC has acquired at least one property in Arlington: The Carmin apartment complex (711 Brentford Pl.). [*Id.* at ¶ 9.] Upon information and belief, the La Villa HFC has applied for, but has not received, a tax exemption for this property. [*Id.*] The Carmin is appraised at $23.9 million; if taken off the tax rolls, it would cause the Tarrant County Appraisal District to lose about $522,000 in annual ad valorem tax revenue, and Arlington's share of that lost revenue would be approximately $143,000 per year. [*Id.*] In other words, if the La Villa HFC receive a tax exemption for this property, it will likely cause Arlington to lose about $143,000 in annual ad valorem tax revenue. [*Id.*]

31. Because of the widespread nature of this practice (see ¶ 22 *supra*), there has been a strong legislative push to (even more) explicitly outlaw this sort of tax-exemption scheme. *See, e.g.*, 2025 H.B. No. 21 (link). Upon information and belief, because this sort of scheme is about to become indisputably illegal, HFCs have been scrambling to close their out-of-jurisdiction projects and apply for undeserved tax exemptions.

## V. CAUSE OF ACTION: DECLARATORY JUDGMENT & TAX CODE

32. Texas's Uniform Declaratory Judgments Act (UDJA) allows trial courts to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tex. Civ. Prac. & Rem. Code § 37.003. The UDJA further provides that "[a] person . . . whose rights,

status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004(a). The Legislature intended the UDJA to be "remedial" and "liberally construed," and "its purpose is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Id.* § 37.002(b).

33.     In a declaratory action, like this one, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id.* § 37.009.

34.     Arlington asks for a declaratory judgment from this Court declaring that the Act does not allow the Defendant HFCs acquire real property in Arlington or to bestow tax exemptions to Arlington-based properties.

35.     The Tax Code, moreover, provides that "[a] taxing unit," like Arlington, "may sue the appraisal district that appraises property for the unit to compel the appraisal district to comply with . . . applicable law." Tex. Tax Code § 43.01. And it further empowers this Court to "enter . . . orders necessary to compel compliance by the appraisal office." *Id.* § 43.03.

36.     Pursuant to these laws, Arlington asks for this Court to prevent Defendant Bobbitt from unlawfully awarding any further tax exemptions to the Defendant HFCs. *See id.* §§ 43.01, 43.03; Tex. Civ. Prac. & Rem. Code §§ 37.001 *et seq.*

## VI.     APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

37.     To stop the Defendant HFCs from unlawfully removing any more Arlington-based properties from the tax rolls, Arlington asks this Court for a temporary restraining order ("TRO") that prohibits the Defendant HFCs from (a) closing on any Arlington-based properties or (b) requesting, obtaining, or receiving any tax exemptions for Arlington-based properties.

38.     Arlington further requests a TRO that prohibits Joe Don Bobbitt, the Chief Appraiser of the Tarrant Appraisal District, from granting tax exemptions requested by the Defendant HFCs regarding any Arlington-based properties.

39.     Arlington requests the Court to issue this TRO without notice to Defendants. Rule 680 allows the Court to issue a TRO without notice if it "clearly appears from specific facts shown

by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon." Tex. R. Civ. P. 680.

40.     Arlington has seen a surge in out-of-jurisdiction HFC activity, with many moving to close on properties and apply for tax exemptions at breakneck speed; and at least one of the Defendant HFCs has averred to the Arlington City Attorney that it is on the verge of closing on at least one Arlington-based property in the coming days [Exhibit 2 at ¶ 5], and Arlington believes these HFCs will rush to close on deals and seek exemptions if they are made aware of this TRO application.

41.     The Pleasanton HFC and the La Villa HFC, moreover, have recently closed on Arlington properties and, upon information and belief, plan to request undeserved tax exemptions for these properties. [Exhibit 1 at ¶¶ 8–9.] If these HFCs receive these requested exemptions, Arlington will irrevocably lose about $545,000 in annual ad valorem tax revenue. [*Id.*]

42.     Additionally, as previously noted, this sort of tax-exemption scheme is, in all likelihood, about to become indisputably illegal, and Arlington believes the Defendant HFCs are already in a rush to close on as many out-of-jurisdiction deals as possible in the coming weeks and months. A no-notice TRO will prevent this unlawful behavior from occurring and will not unduly prejudice the Defendant HFCs in the short-term.

43.     Judge Betsy Lambeth, of the 425th District Court in Williamson County, recently granted a no-notice TRO against the Cameron County HFC on virtually identical grounds. [*See* Plf. Orig. Pet. & TRO, *Williamson Cnty. et al. v. Cameron Cnty. Housing Finance Corp.*, 425th Judicial District Court, No. 25-0488-C425 (March 5, 2025), attached hereto as **Exhibit 3**.]

44.     This Court should follow suit and issue a TRO that prevents the Defendant HFCs from overstepping their jurisdictional bounds and from requesting tax-exempt status for any Arlington-based properties. And out of an abundance of caution, this Court should also issue a TRO against the Defendant Joe Don Bobbitt, the Chief Appraiser of the Tarrant Appraisal District, that prevents him from granting tax exemptions requested by the Defendant HFCs regarding any

Arlington-based properties.

45. Once that TRO has expired, Arlington asks for a temporary injunction. "To obtain a temporary injunction, [an] applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "Whether to grant or deny a temporary injunction is within the trial court's sound discretion," and an order granting injunctive relief will be reversed on appeal only if "the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Id.*

46. All these elements are present. Arlington has pled two causes of action against Defendants: a declaratory action under the UDJA and an action pursuant to Chapter 43 of the Tax Code. Tex. Civ. Prac. & Rem. Code §§ 37.001 *et seq.*; Tex. Tax Code §§ 43.01 *et seq.* Arlington has shown it will likely be successful in these actions, as the Act's plain language prohibits the Defendant HFCs' complained-of conduct. And, in the absence of injunctive relief, the Defendant HFCs are likely to close on several more Arlington-based properties and acquire 100% tax exemptions, which would lead to an irreversible removal of these properties from the local tax rolls, causing Arlington to forever lose out on hundreds of thousands, if not millions, of much-needed tax revenues. Simply put, this is precisely the sort of case in which equitable relief is warranted.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff City of Arlington respectfully asks this Court for the following relief:

(A) To issue a TRO against the Defendant HFCs and Defendant Joe Don Bobbitt that (i) prevents the Defendant HFCs from requesting tax exemptions for any Arlington-based properties, and (ii) prevents Defendant Bobbitt from granting tax exemptions requested by the Defendant HFCs regarding any Arlington-based properties. A proposed TRO was filed contemporaneously herewith.

(B) After the expiration of this TRO, and after a hearing, to issue a temporary injunction

against the same Defendants that enjoins the same unlawful conduct pending trial.

(C)  After the expiration of this temporary injunction, and after a final trial on the merits, to issue (i) a declaratory judgment declaring that the Texas Housing Finance Corporation Act, Tex. Local Gov't Code §§ 394.001 *et seq.*, does not allow the Defendants HFCs to acquire real property in Arlington or bestow tax-exempt status to properties located in Arlington; and (ii) a permanent injunction that prevents the Defendant Bobbitt from granting tax exemptions requested by the Defendant HFCs regarding any Arlington-based properties.

(D)  To award Plaintiff its attorney's fees and costs.

(E)  To award any other relief this Court deems appropriate.

Respectfully submitted,

By: */s/ Alexander J. Lindvall*
   Galen G. Gatten
      State Bar No. 24032226
      galen.gatten@arlingtontx.gov
   Alexander J. Lindvall
      State Bar No. 24139409
      alexander.lindvall@arlingtontx.gov
   Jonathan M. Moss
      State Bar No. 24084934
      jonathan.moss@arlingtontx.gov
   Joseph N. Nguyen
      State Bar No. 24058021
      joseph.nguyen@arlingtontx.gov
   Nena Chima-Tetteh
      State Bar No. 24113691
      nena.chima-tetteh@arlingtontx.gov

**CITY OF ARLINGTON**
**CITY ATTORNEY'S OFFICE**
P.O. Box 90231, MS 63-0300
Arlington, Texas 76004
Phone: 817-459-6878
***Attorneys for Plaintiff City of Arlington***

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alexander Lindvall on behalf of Alexander Lindvall
Bar No. 24139409
alexander.lindvall@arlingtontx.gov
Envelope ID: 101486661
Filing Code Description: Amended Filing
Filing Description: Arlington's Third Amended Petition and Request for TRO and Injunctive Relief
Status as of 6/2/2025 12:00 PM CST

Associated Case Party: THECITY OF ARLINGTON

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Galen Gatten | | galen.gatten@arlingtontx.gov | 6/2/2025 10:27:14 AM | SENT |
| Alexander JLindvall | | alexander.lindvall@arlingtontx.gov | 6/2/2025 10:27:14 AM | SENT |

Associated Case Party: THEPECOS HOUSING FINANCE CORPORATION

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeffrey MTillotson | | jtillotson@tillotsonlaw.com | 6/2/2025 10:27:14 AM | SENT |
| Jonathan RPatton | | jpatton@tillotsonlaw.com | 6/2/2025 10:27:14 AM | SENT |
| Kira Lytle | | klytle@tillotsonlaw.com | 6/2/2025 10:27:14 AM | SENT |
| TJP Service | | tillotsonjohnsonpatton@gmail.com | 6/2/2025 10:27:14 AM | SENT |
| Kathryn Yukevich | 24133390 | kyukevich@tillotsonlaw.com | 6/2/2025 10:27:14 AM | SENT |

Associated Case Party: JOEDONBOBBITT

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joe DonBobbitt | | jdbobbitt@tad.org | 6/2/2025 10:27:14 AM | SENT |

Associated Case Party: THEPLEASANTON HFC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Blake Stribling | | bstribling@chasnoffstribling.com | 6/2/2025 10:27:14 AM | SENT |
| Kim Decker | | kdecker@chasnoffstribling.com | 6/2/2025 10:27:14 AM | SENT |
| Daniel Lecavalier | 24129028 | dlecavalier@chasnoffstribling.com | 6/2/2025 10:27:14 AM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alexander Lindvall on behalf of Alexander Lindvall
Bar No. 24139409
alexander.lindvall@arlingtontx.gov
Envelope ID: 101486661
Filing Code Description: Amended Filing
Filing Description: Arlington's Third Amended Petition and Request for TRO and Injunctive Relief
Status as of 6/2/2025 12:00 PM CST

Associated Case Party: THEPLEASANTON HFC

| Daniel Lecavalier | 24129028 | dlecavalier@chasnoffstribling.com | 6/2/2025 10:27:14 AM | SENT |
| Lisa O'Sullivan | | losullivan@chasnoffstribling.com | 6/2/2025 10:27:14 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Liz Hansen | | lhansen@lsejlaw.com | 6/2/2025 10:27:14 AM | SENT |
| Jonathan Moss | | jonathan.moss@arlingtontx.gov | 6/2/2025 10:27:14 AM | SENT |
| Nena Chima-Tetteh | | nena.chima-tetteh@arlingtontx.gov | 6/2/2025 10:27:14 AM | SENT |
| Eric Ruiz | | eruiz@lsejlaw.com | 6/2/2025 10:27:14 AM | SENT |
| Jannet Alarcon | | jannet.alarcon@fortworthtexas.gov | 6/2/2025 10:27:14 AM | SENT |
| Erica Salas | | erica.salas@arlingtontx.gov | 6/2/2025 10:27:14 AM | SENT |
| JAMES EVANS | | JEVANS@LSEJLAW.COM | 6/2/2025 10:27:14 AM | SENT |
| Joseph Nguyen | | joseph.nguyen@arlingtontx.gov | 6/2/2025 10:27:14 AM | SENT |
| Steve ACumbie | | stephen.cumbie@fortworthtexas.gov | 6/2/2025 10:27:14 AM | SENT |
| Christopher BMosley | | chris.mosley@fortworthtexas.gov | 6/2/2025 10:27:14 AM | SENT |
| Olyn Poole | | olyn.poole@fortworthtexas.gov | 6/2/2025 10:27:14 AM | SENT |

Associated Case Party: THELA VILLA HFC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Daniel Lecavalier | 24129028 | dlecavalier@chasnoffstribling.com | 6/2/2025 10:27:14 AM | SENT |
| Rosa Perez | | rosaperez@cityoflavilla.org | 6/2/2025 10:27:14 AM | SENT |

Associated Case Party: THECITY OF FORT WORTH

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alexander Lindvall on behalf of Alexander Lindvall
Bar No. 24139409
alexander.lindvall@arlingtontx.gov
Envelope ID: 101486661
Filing Code Description: Amended Filing
Filing Description: Arlington's Third Amended Petition and Request for TRO and Injunctive Relief
Status as of 6/2/2025 12:00 PM CST

Associated Case Party: THECITY OF FORT WORTH

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Chandra  Jackson | | chandra.jackson@fortworthtexas.gov | 6/2/2025 10:27:14 AM | SENT |
| THE CITY OF FORT WORTH | | Chandra.Jackson@fortworthtexas.gov | 6/2/2025 10:27:14 AM | SENT |
| THE A.CITY OF FORT WORTH | | stephen.cumbie@fortworthtexas.gov | 6/2/2025 10:27:14 AM | SENT |

# EXHIBIT C

## CAUSE NO. 348-363561-25

| | | |
|---|---|---|
| CITY OF ARLINGTON, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| PECOS HOUSING FINANCE | § | |
| CORPORATION, a Texas nonprofit | § | |
| corporation; JOE DON BOBBITT, in his | § | |
| official capacity as Chief Appraiser of the | § | 348th JUDICIAL DISTRICT |
| Tarrant Appraisal District, | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF FORT WORTH | § | |
| | § | |
| *Intervenor-Plaintiff* | § | TARRANT COUNTY, TEXAS |

---

## CITY OF FORT WORTH'S FOURTH AMENDED PETITION IN INTERVENTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

---

TO THE HONORABLE JUDGE OF THIS COURT:

In support of its Petition in Intervention and its Application for a Temporary Restraining Order and Injunctive Relief, Plaintiff-Intervenor City of Fort Worth ("Fort Worth") alleges the following:

### I.     INTRODUCTION

1.     This case concerns a misuse and abuse of the Texas Housing Finance Corporation Act, Tex. Local Gov't Code §§ 394.001 *et seq.* Fort Worth recently learned that the Pecos Housing Finance Corporation ("Pecos HFC"), the Pleasanton Housing Finance Corporation ("Pleasanton HFC") the La Villa Housing Finance Corporation ("La Villa HFC"), the Maverick County Housing Finance Corporation ("Maverick County HFC"), and the Cameron County Housing

Finance Corporation ("Cameron County HFC") have been unlawfully removing Fort Worth-based properties from Tarrant County tax appraisal rolls in exchange for monetary kickbacks resulting in the loss of millions of dollars in real property value from the local tax base.

2. Defendant HFCs' scheme seems to work like this: a private developer acquires land for a new multifamily development (or acquires an already-existing multifamily development) in a city or county other than where the HFC is located; the private developer then conveys that property to the HFC; the HFC, as the new owner, then applies for and receives a 100% tax exemption from the Tarrant Appraisal District, and the property is removed from the tax rolls; the HFC then leases that now-exempt property back to a private landlord (oftentimes the same developer who originally purchased the property), who then shares the profits with the HFC. The upshot of this scheme is that the developer and landlord get a massive tax exemption, the HFC gets to collect fees and a portion of the development's profits, and the other city (in this case, Fort Worth) bears 100% of the downside.

3. In short, a handful of tiny public corporations, located hundreds of miles away in towns with no connection to Fort Worth, have drastically reduced Fort Worth's yearly tax revenue by millions of dollars while they rake in undeserved fees and profits from Fort Worth-based rental properties. Fort Worth now intervenes to ask this Court to halt the Defendant HFCs' unlawful behavior before they do any further irreversible damage to Fort Worth's tax base, and to stop the Chief Appraiser of the Tarrant Appraisal District from granting tax exemptions requested by the Defendant HFCs for any Fort Worth- based properties.

## II. PARTIES

4. Plaintiff City of Arlington is a home-rule municipality located in Tarrant County, Texas.

5. Intervenor-Plaintiff City of Fort Worth is a home-rule municipality located in Tarrant County, Texas.

6. Defendant Pecos HFC is a Texas nonprofit corporation. It has already been served

and appeared.

7. Defendant Pleasanton HFC is a Texas nonprofit corporation. It has already been served and appeared.

8. Defendant La Villa HFC is a Texas nonprofit corporation. It has already been served and appeared.

9. Defendant Maverick County HFC is a Texas nonprofit corporation. It has already been served and appeared.

10. Defendant Cameron County HFC is a Texas nonprofit corporation. It can be served with citation through its registered agent, Mark A. Yates, at 216 S Sam Houston Blvd, STE 2-B, San Benito, Texas 78586, or wherever else he may be located.

11. Defendant Joe Don Bobbitt is the Chief Appraiser of the Tarrant Appraisal District. He is being sued in his official capacity only and has already been served and appeared.

### III. JURISDICTION, VENUE, AND DISCOVERY CONTROL PLAN

12. This Court has jurisdiction over this matter because Plaintiffs seek relief within the jurisdictional limits of this Court. *See* Tex. Civ. Prac. & Rem. Code §§ 65.001 *et seq.*; Tex. R. Civ. P. 680.

13. Venue is proper in Tarrant County because all (or at least a substantial part) of the events and actions giving rise to this case occurred in Tarrant County—and by conducting business in Tarrant County, Defendants have purposely availed themselves to this venue. *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(1). This suit, moreover, concerns real property located in Tarrant County, making Tarrant County the mandatory venue for this case. *See id.* § 15.011.

14. Venue is also proper pursuant to the Tax Code, which provides that "[a] taxing unit," like Fort Worth, "may sue the appraisal district that appraises property for the unit to compel

City of Fort Worth's Fourth Amended Petition in Intervention and its Application for a
Temporary Restraining Order and Injunctive Relief

Page 3

the appraisal district to comply with…applicable law." Tex. Tax Code § 43.01. It further provides that, in such a suit, "[v]enue is in the county in which the appraisal district is established." *Id.* § 43.02. As such, because Fort Worth (a taxing unit) is suing the Tarrant Appraisal District, Tarrant County is the mandatory venue for this case. *Id.* Sections 43.01 and 4303 of the Tax Code, moreover, waive any governmental immunity Defendant Bobbitt might have.

15.    Plaintiffs intend to conduct discovery in this case under the Level 3 discovery control plan. *See* Tex. R. Civ. P. 190.4.

## IV.    BACKGROUND & RELEVANT LAW

### A.    The Texas Housing Finance Corporation Act.

16.    This suit concerns the Texas Housing Finance Corporation Act, Tex. Local Gov't Code §§ 394.001 *et seq.* ("the Act"). The Act was passed in 1979 to help facilitate the development of low-income housing. *See* Tex. Local Gov't Code § 394.002(a) (the Act's purpose is to "provide a means to finance the cost of residential ownership and development that will provide decent, safe, and sanitary housing at affordable prices for residents of local governments").

17.    To help create more low-income housing, the Act empowers local governments to create Housing Finance Corporations ("HFCs")—nonprofit organizations, comprised of local officials, that help coordinate and facilitate affordable-housing projects. *See* Tex. Local Gov't Code §§ 394.002, 394.011(a), 394.032. And because HFCs are (at least in theory) furthering a public purpose, the Act provides that HFC-owned properties and the income derived from those properties are tax-exempt. *Id.* § 394.905 ("The housing finance corporation, all property owned by it, the income from the property, all bonds issued by it, the income from the bonds, and the transfer of the bonds are exempt, as public property used for public purposes, from license fees, recording fees, and all other taxes imposed by this state or any political subdivision of this state.").

18. HFCs are commonly a part of public/private real estate partnerships, in which a private developer acquires land for a new development or acquires an existing multifamily project and then conveys it to an HFC, which then acquires tax-exempt status for the property and leases the property to a private landlord who, in turn, pays fees to the HFC and shares the profits generated by the property with the HFC.

19. But because the Act allows for such an enormous tax benefit, it provides two specific restrictions on what residential developments an HFC can tax-exempt: (1) a residential development can receive tax exemption from an HFC only if at least 90% of the development "is for use by or is intended to be occupied by persons of low and moderate income," as defined by the statute, *id.* § 394.004; and (2) the residential development "must be located within the local government," *id.* § 394.903.

20. An HFC, in other words, can tax-exempt a residential development only if the development is located within the HFC's local jurisdiction and is actually used to house low-income individuals. *See id.* §§ 394.004, 394.903.

**B.    Defendant HFCs are unlawfully exempting properties in Fort Worth that do not house low-income residents.**

21. Fort Worth has learned that the Defendant HFCs have been ignoring these statutory restrictions and have been seeking and acquiring tax exemptions for large, multifamily housing developments in Fort Worth.

22. As described in further detail below, the Defendant HFCs' unlawful tax-exemption scheme has already removed hundreds of millions of dollars from Tarrant County taxing units' tax rolls and have caused Fort Worth to lose millions of dollars in annual tax revenue.

23. To illustrate, in October of 2024, Defendant Maverick County HFC acquired The

Sovereign (5301 North Tarrant Parkway)[1]—an already-built, self-described "luxury apartment community" located in far north Fort Worth.[2] After acquiring this complex, Maverick County HFC applied for and received a full tax exemption for this property.[3] This property is appraised at $80,369,852.[4] So, when it was removed from the tax rolls, it caused the Tarrant County Appraisal District to lose over $1.8 million in annual ad valorem tax revenue, and Fort Worth's share of that revenue is over $540,000.[5]

24.     In other words, by exempting just one apartment complex in Fort Worth, the Maverick County HFC caused the City of Fort Worth to lose over a half million dollars in annual tax revenue, and there is no clear path for Fort Worth (or other affected local entities) to recoup that loss.

25.     To make matters worse, it appears that The Sovereign doesn't even provide low-income housing. Its smallest unit, a 660 square foot one-bedroom apartment, rents for $1,379 per month.[6] Upon information and belief, this complex does not come close to meeting the 90%-low-to moderate- income housing threshold needed to receive an exemption under the Act. *See* Tex. Local Gov't Code § 394.004 (providing that a residential development can receive tax exemption from a HFC only if at least 90% of the development "is for use by or is intended to be occupied by persons of low and moderate income").

26.     In another example, on January 24, 2025, Defendant Pleasanton HFC acquired the Rocklyn Fort Worth apartment complex, located at 637 Samuels Avenue in the Rocklyn Trinity Uptown neighborhood on the bluffs overlooking the west fork of the Trinity River just north of

---

[1] https://www.tad.org/property?account=41652207
[2] https://www.sovereignkeller.com
[3] https://www.tad.org/property?account=41652207
[4] *Id.*
[5] Calculated from information found at https://taxonline.tarrantcounty.com/TaxWeb/ratesExemptions.asp
[6] https://www.sovereignkeller.com/floor-plans

Downtown Fort Worth.[7] Pleasanton HFC promptly secured a tax exemption for this property, removing its assessed value of over $70 million from the Tarrant County tax rolls.[8] This upscale apartment complex currently offers one- to three-bedroom apartments for monthly rents ranging from $1,464 to $2,976,[9] and upon information and belief, also does not satisfy the low- to moderate-income housing threshold required for an exemption under the Act. In fact, there appears to be no reason to believe renter demographics for this property have in any way changed since the complex opened in 2018. If true, Pleasanton HFC's acquisition of this property has done nothing to increase access to affordable housing as required by statute. Meanwhile, its exemption from property taxes provides the complex with a windfall savings of over $1.5 million annually.[10] Fort Worth loses approximately $474,000 in yearly tax revenue, yet still bears the costs of providing city services to the property.[11]

27. This is a widespread problem across the state. The City of Euless, for example, has seen at least a 2% drop in its overall annual revenue after a *single* apartment complex received tax-exempt status from the Cameron County HFC;[12] and Dallas, McKinney, Irving, Lewisville, and other north Texas cities have reported millions of dollars in total lost tax revenue.[13] Worse, these out-of-jurisdiction HFCs are often bestowing tax-exempt status to already-built structures (not new projects), and many of the exempted properties aren't even affordable-housing projects; they are typical for-profit apartments and condos, usually located in upmarket neighborhoods, that do not

---

[7] https://www.tad.org/property?account=42402920, https://www.tad.org/property?account=42402938, and https://www.tad.org/property?account=42402946
[8] *Id.*
[9] https://www.rocklynfortworth.com/floorplans
[10] Calculated from information found at https://taxonline.tarrantcounty.com/TaxWeb/ratesExemptions.asp
[11] *Id.*
[12] Andrea Lucia, *Euless Loses 2 Percent of Revenue to Controversial Tax Break Approved in Faraway County*, CBS News (Feb. 21, 2024).
[13] Andrea Lucia, *Housing Group Made Millions Getting Tax Breaks for Developers, Costing Cities and Schools Even More*, CBS News (Dec. 22, 2023).

offer reduced rent, housing vouchers, or other benefits to low-income applicants.[14]

28.     According to information available on the Tarrant Appraisal District website, Defendant HFCs currently own a total of 39 properties located in Fort Worth [See the spreadsheet attached hereto as **Exhibit A**]. For 19 of these properties, Defendants have already been granted a 2025 tax exemption by the Tarrant Appraisal District. These 19 exempt properties have a combined assessed value of $728,110,842.00 for the current tax year. The removal of this nearly three quarters of a billion dollars of taxable value from Tarrant County tax rolls will cost the City of Fort Worth approximately $4.9 million in 2025 tax revenue, and will similarly affect the tax revenues of Tarrant County, Tarrant Regional Water District, Tarrant County Hospital District, Tarrant County College, and the Fort Worth, Keller, Eagle Mountain-Saginaw, Crowley and Northwest Independent School Districts.

29.     Defendant HFCs currently own another 20 properties in Fort Worth for which they have not yet acquired a tax exemption. These 20 properties have a combined assessed 2025 value of $651,302,542.00. These properties are the focus of Fort Worth's claims in this lawsuit. Fort Worth intervenes to enjoin Defendants from acquiring tax-exempt status on these properties and to prevent this additional taxable value from being removed from the tax rolls, which otherwise would cost the City $4.4 million in tax revenue.

30.     Because of the widespread nature of this practice, there was a strong bipartisan legislative push to remove any doubt about the illegality of this sort of tax-exemption scheme. *See, e.g.*, 2025 H.B. No. 21.[15] This bill has been signed by the governor and is now law.

---

[14] *Id.* (documenting that an out-of-town HFC purchased an apartment complex in a "luxurious community" in Irving and that the tenants' rents went *up* significantly under the HFC's ownership).
[15] https://legiscan.com/TX/text/HB21/id/3053018

## C.    Texas Constitution

31.    Tex. Const. art. VIII Section 11 limits counties' ad valorem taxation authority to property within their prospective boundaries. Any law that purports to allow a local government to take properties off the tax rolls outside jurisdiction of that local government violates this constitutional principle.

## V.    CAUSE OF ACTION: DECLARATORY JUDGMENT & TAX CODE

32.    Texas's Uniform Declaratory Judgments Act (UDJA) allows trial courts to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tex. Civ. Prac. & Rem. Code § 37.003. The UDJA further provides that "[a] person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004(a). The Legislature intended the UDJA to be "remedial" and "liberally construed," and "its purpose is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Id.* § 37.002(b).

33.    In a declaratory action, like this one, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id.* § 37.009.

34.    Fort Worth asks for a declaratory judgment from this Court that the Act prohibits Defendant HFCs from acquiring property outside of their geographical jurisdictions;

35.    Fort Worth asks for a declaratory judgment from this Court declaring that the Act does not allow Defendants to bestow tax exemptions to Fort Worth-based properties.

36.    Fort Worth further asks for a declaratory judgment that Article VIII, Section 11 of the Texas Constitution limits counties' ad valorem taxation authority to "property within their respective boundaries" and that the Defendants' scheme violates Constitutional limits on the scope

of Texas counties' taxing authority.

37.     The Tax Code, moreover, provides that "[a] taxing unit may sue the appraisal district that appraises property for the unit to compel the appraisal district to comply with …applicable law." Tx. Tax Code § 43.01. It further empowers this Court to "enter…orders necessary to compel compliance by the appraisal office." *Id.* § 43.03.

38.     Pursuant to these laws, Fort Worth asks this Court to prevent Defendant Bobbitt from unlawfully awarding any further tax exemptions to the Defendant HFCs. *See id.* § 43.01, 43.03; TEX. CIV. PRAC. & REM. CODE §§ 37.001 *et seq.*

## VI.     APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

39.     To stop the Defendant HFCs from closing on any more Fort Worth-based properties, Fort Worth asks this Court for a temporary restraining order ("TRO") and a temporary injunction that prohibits the Defendant HFCs from (a) closing on any Fort Worth-based properties or (b) requesting or receiving any tax exemptions for Fort Worth-based properties.

40.     Fort Worth further requests a TRO and a temporary injunction that prohibits Joe Don Bobbitt, the Chief Appraiser of the Tarrant Appraisal District, from granting tax exemptions requested by the Defendant HFCs regarding any Fort Worth-based properties.

41.     Fort Worth requests that this Court issue this TRO without notice to Defendants. Rule 680 allows the Court to issue a TRO without notice if it "clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon." Tex. R. Civ. P. 680. Additionally, as previously noted, this sort of tax-exemption scheme is, in all likelihood, about to become indisputably illegal, and Fort Worth believes the Defendant HFCs are already in a rush to close on as many out-of-jurisdiction deals as possible in the coming weeks and

months. A no-notice TRO will prevent this unlawful behavior from occurring and will not unduly prejudice the Defendant HFCs in the short-term.

41.    Judge Betsy Lambeth, of the 425th District Court in Williamson County, recently granted a no-notice TRO against the Cameron County HFC on virtually identical grounds. [*See* Plf. Orig. Pet. & TRO, *Williamson Cnty. et al. v. Cameron Cnty. Housing Finance Corp.*, 425th Judicial District Court, No. 25-0488-C425 (March 5, 2025), attached hereto as **Exhibit B.**]

42.    This Court should follow suit and issue a TRO that prevents Defendant HFCs from overstepping jurisdictional bounds and from requesting tax-exempt status for any Fort Worth-based properties. And out of an abundance of caution, this Court should also issue a TRO against the Defendant Joe Don Bobbitt, the Chief Appraiser of the Tarrant Appraisal District, that prevents him from granting tax exemptions requested by a Defendant HFC regarding any Fort Worth-based property.

43.    Once that TRO has expired, Fort Worth asks for a temporary injunction. "To obtain a temporary injunction, [an] applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "Whether to grant or deny a temporary injunction is within the trial court's sound discretion," and an order granting injunctive relief will be reversed on appeal only if "the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Id.*

44.    All these elements are present. Fort Worth has pleaded a cause of action against Defendants: a declaratory action under the UDJA. Fort Worth has shown it will likely be successful in this declaratory action, as the Act's plain language prohibits Defendant HFCs' complained-of conduct. And, in the absence of injunctive relief, Defendant HFCs are likely to close on additional

Fort Worth-based properties and/or apply for a tax exemptions, which would lead to an irreversible removal of this property from the local tax rolls. Simply put, this is precisely the sort of case in which equitable relief is warranted.

## PRAYER FOR RELIEF

Based on the foregoing, Intervenor-Plaintiff City of Fort Worth respectfully asks this Court for the following relief:

(A)     To issue a TRO and temporary injunction against Defendant HFCs and Defendant Joe Don Bobbitt that (i) prevents Defendant HFCs from requesting or receiving tax exemptions for any Fort Worth-based properties, and (ii) prevents Mr. Bobbitt from granting tax exemptions requested by Defendant HFCs regarding any Fort Worth-based properties. A proposed TRO was filed contemporaneously herewith.

(B)     After the expiration of this TRO, and after a hearing, to issue a temporary injunction against the same Defendants that enjoins the same unlawful conduct pending trial.

(C)     After a final trial on the merits, to issue (i) a declaratory judgment declaring that the Texas Housing Finance Corporation Act, Tex. Local Gov't Code §§ 394.001 *et seq.*, does not allow Defendant HFCs to bestow tax-exempt status to properties located in Fort Worth; a declaration that Defendant HFCs may not acquire property in Fort Worth; and a declaration and permanent injunction against the Chief Appraiser of TAD from grant further tax exemptions to foreign HFCs.

(D)     To award Fort Worth its attorney's fees and costs.

(E)     To award any other relief this Court deems appropriate.

Respectfully submitted,

/s/ Stephen A. Cumbie
STEPHEN A. CUMBIE
Senior Assistant City Attorney
State Bar No. 24056724
stephen.cumbie@fortworthtexas.gov

CHRISTOPHER B. MOSLEY
Senior Assistant City Attorney
State Bar No. 00789505
chris.mosley@fortworthtexas.gov

OLYN POOLE
Senior Assistant City Attorney
State Bar No. 24037292
olyn.poole@fortworthtexas.gov

CITY OF FORT WORTH
Office of the City Attorney
100 Fort Worth Trail
Fort Worth, Texas 76102
P: (817) 392-7600

## CERTIFICATE OF SERVICE

I certify that on the 10th day of June 2025 a true and correct copy of the foregoing document was e-filed with the Clerk of the Court and electronically served upon all counsel of record in accordance with the Texas Rules of Civil Procedure.

/s/ Stephen A. Cumbie
STEPHEN A. CUMBIE

| | | |
|---|---|---|
| CITY OF ARLINGTON, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| PECOS HOUSING FINANCE | § | |
| CORPORATION, a Texas nonprofit | § | |
| corporation; JOE DON BOBBITT, in his | § | |
| official capacity as Chief Appraiser of the | § | 348th JUDICIAL DISTRICT |
| Tarrant Appraisal District, | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF FORT WORTH | § | |
| | § | |
| *Plaintiff-Intervenor* | § | TARRANT COUNTY, TEXAS |

---

## VERIFICATION

---

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, the undersigned Notary Public in and for the State of Texas on this day personally appeared Stephen A. Cumbie, Senior Assistant City Attorney for the City of Fort Worth, who, after being duly sworn, stated under oath that he has read the above Fourth Amended Petition in Intervention and its Application for a Temporary Restraining Order and Injunctive Relief; and

that every statement contained therein is within his personal knowledge and is true and correct.

_____
Stephen A. Cumbie, Affiant

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 10th day of June 2025.

LAURA GREGORY
Notary Public, State of Texas
Comm. Expires 03-08-2028
Notary ID 4463814

_____
Notary Public in and for
The State of Texas



City of Fort Worth
EXHIBIT A

## TRAVELING HFCs IN THE CITY OF FORT WORTH

| PROPERTY ADDRESS | HOUSING FINANCE CORPORATION | DATE OF ACQUISITION | EXEMPTION STATUS | PROPERTY VALUE | FORT WORTH'S LOST REVENUE | TARRANT APPRAISAL DISTRICT WEBSITE LINK |
|---|---|---|---|---|---|---|
| 5200 VILLAGE LN | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2022-06-13 | EXEMPT | $4,532,147.00 | $30,478.69 | https://www.tad.org/property?account=04705939 |
| 5221 VILLAGE LN | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2022-06-13 | EXEMPT | $3,183,667.00 | $21,410.16 | https://www.tad.org/property?account=04705947 |
| 5300 VILLAGE LN | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2022-06-13 | EXEMPT | $6,279,526.00 | $42,229.81 | https://www.tad.org/property?account=04705912 |
| 5301 VILLAGE LN | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2022-06-13 | EXEMPT | $2,954,426.00 | $19,868.51 | https://www.tad.org/property?account=04705920 |
| 2324 MEADOWBROOK GARDENS DR | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2025-01-17 | EXEMPT | $17,131,387.00 | $115,208.58 | https://www.tad.org/property?account=04849264 |
| 4500 CAMPUS DR | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2022-12-01 | EXEMPT | $164,396,992.00 | $1,105,569.77 | https://www.tad.org/property?account=04981812 |
| 300 W. MORPHY ST | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2022-09-30 | EXEMPT | $49,971,533.00 | $336,058.56 | https://www.tad.org/property?account=42332301 |
| 5301 NORTH TARRANT PKWY | MAVERICK COUNTY HOUSING FINANCE CORPORATION | 2024-10-09 | EXEMPT | $80,369,852.00 | $540,487.25 | https://www.tad.org/property?account=41652207 |
| 3391 WESTERN CENTER BLVD | PECOS HOUSING FINANCE CORPORATION | 2025-02-27 | EXEMPT | $41,184,002.00 | $276,962.41 | https://www.tad.org/property?account=07008937 |
| 5801 BRIDGE ST | PECOS HOUSING FINANCE CORPORATION | 2025-01-15 | EXEMPT | $28,579,464.00 | $192,196.90 | https://www.tad.org/property?account=04972759 |
| 6051 BRIDGE ST | PECOS HOUSING FINANCE CORPORATION | 2025-01-15 | EXEMPT | $22,355,436.00 | $150,340.31 | https://www.tad.org/property?account=04977848 |
| 6776 WESTCREEK DR | PECOS HOUSING FINANCE CORPORATION | 2024-12-19 | EXEMPT | $33,857,834.00 | $227,693.93 | https://www.tad.org/property?account=05628954 |
| 8901 S NORMANDALE ST | PECOS HOUSING FINANCE CORPORATION | 2025-02-15 | EXEMPT | $30,773,181.00 | $206,949.64 | https://www.tad.org/property?account=03435024 |
| 9051 S NORMANDALE ST | PECOS HOUSING FINANCE CORPORATION | 2025-02-15 | EXEMPT | $13,921,653.00 | $93,623.12 | https://www.tad.org/property?account=03435076 |
| 2188 E LOOP 820 | PLEASANTON HOUSING FINANCE CORPORATION | 2024-11-15 | EXEMPT | $29,852,508.00 | $200,758.12 | https://www.tad.org/property?account=01184954 |
| 637 SAMUELS AVE | PLEASANTON HOUSING FINANCE CORPORATION | 2025-01-24 | EXEMPT | $1,317,700.00 | $8,861.53 | https://www.tad.org/property?account=42402920 |
| 637 SAMUELS AVE | PLEASANTON HOUSING FINANCE CORPORATION | 2025-01-24 | EXEMPT | $16,012,497.00 | $107,684.04 | https://www.tad.org/property?account=42402938 |
| 8100 N RIVERSIDE DR | PLEASANTON HOUSING FINANCE CORPORATION | 2025-01-24 | EXEMPT | $53,196,755.00 | $357,748.18 | https://www.tad.org/property?account=42402946 |
| 9632 BERKSHIRE LAKE BLVD | PLEASANTON HOUSING FINANCE CORPORATION | 2024-10-31 | EXEMPT | $58,188,517.00 | $391,317.78 | https://www.tad.org/property?account=4110475 |
| BLUE MOUND RD | PLEASANTON HOUSING FINANCE CORPORATION | 2025-03-18 | EXEMPT | $69,600,728.00 | $468,064.90 | https://www.tad.org/property?account=42729627 |
| 2200 TAXCO RD | PLEASANTON HOUSING FINANCE CORPORATION | 2025-01-27 | EXEMPT | $451,037.00 | $3,033.22 | https://www.tad.org/property?account=42721201 |
| 2006 TAXCO RD | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2025-05-22 | NO EXEMPTIONS | $10,381,386.00 | $69,814.82 | https://www.tad.org/property?account=04691865 |
| 500 E LOOP 820 | CAMERON COUNTY HOUSING FINANCE CORPORATION | 2025-05-22 | NO EXEMPTIONS | $23,876.00 | $160.57 | https://www.tad.org/property?account=05968631 |
| 8925 RANDOL MILL RD | LA VILLA HOUSING FINANCE CORPORATION | 2025-04-04 | NO EXEMPTIONS | $24,554,971.00 | $165,132.18 | https://www.tad.org/property?account=04325893 |
| 14301 CENTRE STATION DR | LA VILLA HOUSING FINANCE CORPORATION | 2025-04-30 | NO EXEMPTIONS | $27,110,245.00 | $182,316.40 | https://www.tad.org/property?account=05550939 |
| 6500 BOCA RATON BLVD | MAVERICK COUNTY HOUSING FINANCE CORPORATION | 2025-02-03 | NO EXEMPTIONS | $101,117,467.00 | $680,014.97 | https://www.tad.org/property?account=41424360 |
| 6501 BOCA RATON BLVD | MAVERICK COUNTY HOUSING FINANCE CORPORATION | 2025-01-17 | NO EXEMPTIONS | $12,398,461.00 | $83,379.65 | https://www.tad.org/property?account=05661846 |
| 13450 ALTA VISTA RD | MAVERICK COUNTY HOUSING FINANCE CORPORATION | 2025-01-17 | NO EXEMPTIONS | $23,082,702.00 | $155,231.17 | https://www.tad.org/property?account=05662486 |
| 113 WESTERN SWING WAY | MAVERICK COUNTY HOUSING FINANCE CORPORATION | 2025-04-30 | NO EXEMPTIONS | $42,412,302.00 | $285,222.73 | https://www.tad.org/property?account=07830262 |
| 1505 HOMEDALE DR | PECOS HOUSING FINANCE CORPORATION | 2025-04-09 | NO EXEMPTIONS | $78,184,484.00 | $525,790.65 | https://www.tad.org/property?account=42699604 |
| 5600 COTSWOLD HILLS DR | PECOS HOUSING FINANCE CORPORATION | 2025-03-19 | NO EXEMPTIONS | $25,793,728.00 | $173,462.82 | https://www.tad.org/property?account=04402324 |
| 6250 GRANBURY CUT OFF RD | PECOS HOUSING FINANCE CORPORATION | 2025-03-24 | NO EXEMPTIONS | $27,759,851.00 | $186,685.00 | https://www.tad.org/property?account=00538744 |
| 6991 ANDERSON BLVD | PECOS HOUSING FINANCE CORPORATION | 2025-04-09 | NO EXEMPTIONS | $24,791,114.00 | $166,720.24 | https://www.tad.org/property?account=05503396 |
| 7040 JOHN T WHITE | PECOS HOUSING FINANCE CORPORATION | 2025-03-19 | NO EXEMPTIONS | $228,690.00 | $1,537.94 | https://www.tad.org/property?account=06468071 |
| 8900 RANDOL MILL RD | PECOS HOUSING FINANCE CORPORATION | 2025-03-19 | NO EXEMPTIONS | $25,851,059.00 | $173,848.37 | https://www.tad.org/property?account=05654395 |
| 6130 OAKLAND HILLS DR | PECOS HOUSING FINANCE CORPORATION | 2025-03-24 | NO EXEMPTIONS | $45,043,125.00 | $302,915.02 | https://www.tad.org/property?account=05682045 |
| 6351 VEGA DR | PECOS HOUSING FINANCE CORPORATION | 2025-04-30 | NO EXEMPTIONS | $17,301,375.00 | $116,351.75 | https://www.tad.org/property?account=04855280 |
| 3665 MARINE CREEK PKWY | PECOS HOUSING FINANCE CORPORATION | 2025-05-16 | NO EXEMPTIONS | $22,346,595.00 | $150,280.85 | https://www.tad.org/property?account=04885953 |
| 6032 TRAVERTINE LN | PECOS HOUSING FINANCE CORPORATION | 2025-03-07 | NO EXEMPTIONS | $44,848,502.00 | $301,606.18 | https://www.tad.org/property?account=42793929 |
| 6032 TRAVERTINE LN | PLEASANTON HOUSING FINANCE CORPORATION | 2025-03-07 | NO EXEMPTIONS | $21,211,566.00 | $142,647.78 | https://www.tad.org/property?account=42220783 |
| 8900 COTTONWOOD VILLAGE DR | PLEASANTON HOUSING FINANCE CORPORATION | 2025-03-07 | NO EXEMPTIONS | $51,931,479.00 | $349,239.20 | https://www.tad.org/property?account=42220791 |
| | PLEASANTON HOUSING FINANCE CORPORATION | 2025-02-06 | NO EXEMPTIONS | $24,929,564.00 | $167,651.32 | https://www.tad.org/property?account=06493777 |

CAUSE NO. **25-0488-C425**





City of
Fort Worth

**FILED**
9:39 o'clock ___ ☒M

**EXHIBIT**
C.6. **B**

MAR 0 5 2025

*Lisa David*
District Clerk, Williamson Co., TX

|  |  |  |
|---|---|---|
| WILLIAMSON COUNTY, SIENA MUNICIPAL UTIILTY DISTRICT NO. 1, and SIENA MUNICIPAL UTIILTY DISTRICT NO. 2,<br>*Plaintiffs,*<br><br>v.<br><br>THE CAMERON COUNTY HOUSING FINANCE CORPORATION,<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT, Williamson Co., TX<br><br><br>**425** JUDICIAL DISTRICT<br><br><br>WILLIAMSON COUNTY, TEXAS |

## TEMPORARY RESTRAINING ORDER

After considering the application for a temporary restraining order filed by Plaintiffs in the above-styled matter, the pleadings, and the evidence, the Court finds that—

1.     There is a current controversy over Defendant Cameron County Housing Finance Corporation's ("CCHFC") efforts to seek exemption from ad valorem taxes for properties located in Williamson County, including the following real properties:

a.     Lot 1, Siena Section 30, according to the map or plat thereof recorded as Document No. 2020037410 in the Official Public Records of Williamson County, Texas, located at 6531 CR 110, Round Rock, Texas, 78655.  That property is a 13.677-acre tract of land on which a multi-family apartment project known as Siena Round Rock Apartments has been built ("Siena Round Rock").

b.     Lot 2, Block A, Siena South, according to the map or plat thereof recorded as Document No. 20200099820 in the Official Public Records of Williamson County, Texas, located at 5540 Sofia Place, Round Rock, Texas 78665.  That Property is a

Temporary Restraining Order – Page 1 of 3

Exhibit 1

15.0496-acre tract of land on which a multi-family apartment project known as The Sommery has been built ("The Sommery").

2.    As alleged in the Plaintiffs' petition and supporting verification, CCHFC currently owns Sienna Round Rock, and intends to acquire The Sommery, and seeks to remove both properties from the Williamson Central Appraisal District ad valorem tax rolls, purportedly under Section 394.905 of the Texas Local Government Code.

3.    Imminent harm and irreparable harm will result if CCHFC is permitted to acquire The Sommery and seek and obtain exemptions of Sienna Round Rock and The Sommery from the William Central Appraisal District ad valorem tax rolls. Specifically, if a temporary restraining order is not granted, imminent and irreparable harm will result to Plaintiffs since those properties within their jurisdictions will be removed from the tax rolls, which will immediately impact their fiscal budgeting and decrease the ad valorem taxes they otherwise could collect for these properties.

4.    There is no adequate remedy at law because such damages or harm to Plaintiffs cannot be calculated.

5.    An *ex parte* order, without notice to CCHFC, is necessary because there is not enough time to give notice to CCHFC, hold a hearing, and issue a restraining order before the imminent and irreparable injury, loss or damage occurs.

6.    Therefore, the Court ORDERS that—

    a.    CCHFC, as well as its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with CCHFC, are prohibited from (i) acquiring real property in

Temporary Restraining Order – Page 2 of 3

Exhibit 1

Williamson County, including The Sommery; (ii) seeking or obtaining exemptions from ad valorem taxes for real property in Williamson County, including Siena Round Rock and The Sommery.

b.    The clerk shall issue notice to CCHFC that the hearing on Plaintiffs' request for temporary injunction is set for **March 13**, 2025 at **9:00** ⓐ.m./p.m. The purpose of the hearing shall be to determine whether this temporary restraining order should be made a temporary injunction pending a full trial on the merits.

c.    Plaintiffs are exempt from posting a bond pursuant to Section 6.001 of the Texas Civil Practice and Remedies Code and Section 49.066(f) of the Texas Water Code.

7.    This order expires on **March 14**, 2025 at **9:00**, **A**.m.

Signed:    March **5**, 2025

_____
Presiding Judge

Temporary Restraining Order – Page 3 of 3

Exhibit 1

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laura Gregory on behalf of Stephen Cumbie
Bar No. 24056724
Laura.Gregory@fortworthtexas.gov
Envelope ID: 101852191
Filing Code Description: Amended Filing
Filing Description: City of Fort Worth's Fourth Amended Petition in Intervention and Application for Temporary Restraining Order and Injunctive Relief
Status as of 6/10/2025 4:34 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey MTillotson | | jtillotson@tillotsonlaw.com | 6/10/2025 3:41:10 PM | SENT |
| Jonathan RPatton | | jpatton@tillotsonlaw.com | 6/10/2025 3:41:10 PM | SENT |
| Robert Salinas | 17536000 | rjslawoffice@hotmail.com | 6/10/2025 3:41:10 PM | SENT |
| Roel Gutierrez | 24069842 | roelgutierrezlaw@gmail.com | 6/10/2025 3:41:10 PM | SENT |
| Blake Stribling | | bstribling@chasnoffstribling.com | 6/10/2025 3:41:10 PM | SENT |
| Jonathan Moss | | jonathan.moss@arlingtontx.gov | 6/10/2025 3:41:10 PM | SENT |
| Nena Chima-Tetteh | | nena.chima-tetteh@arlingtontx.gov | 6/10/2025 3:41:10 PM | SENT |
| Daniel Lecavalier | 24129028 | dlecavalier@chasnoffstribling.com | 6/10/2025 3:41:10 PM | SENT |
| Kim Decker | | kdecker@chasnoffstribling.com | 6/10/2025 3:41:10 PM | SENT |
| Liz Hansen | | lhansen@lsejlaw.com | 6/10/2025 3:41:10 PM | SENT |
| Kathryn Yukevich | 24133390 | kyukevich@tillotsonlaw.com | 6/10/2025 3:41:10 PM | SENT |
| Galen Gatten | | galen.gatten@arlingtontx.gov | 6/10/2025 3:41:10 PM | SENT |
| Eric Ruiz | | eruiz@lsejlaw.com | 6/10/2025 3:41:10 PM | SENT |
| Kira Lytle | | klytle@tillotsonlaw.com | 6/10/2025 3:41:10 PM | SENT |
| TJP Service | | tillotsonjohnsonpatton@gmail.com | 6/10/2025 3:41:10 PM | SENT |
| Lisa O'Sullivan | | losullivan@chasnoffstribling.com | 6/10/2025 3:41:10 PM | SENT |
| JAMES EVANS | | JEVANS@LSEJLAW.COM | 6/10/2025 3:41:10 PM | SENT |
| Rosa Perez | | rosaperez@cityoflavilla.org | 6/10/2025 3:41:10 PM | SENT |
| Jannet Alarcon | | jannet.alarcon@fortworthtexas.gov | 6/10/2025 3:41:10 PM | SENT |
| Erica Salas | | erica.salas@arlingtontx.gov | 6/10/2025 3:41:10 PM | SENT |
| Alexander JLindvall | | alexander.lindvall@arlingtontx.gov | 6/10/2025 3:41:10 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laura Gregory on behalf of Stephen Cumbie
Bar No. 24056724
Laura.Gregory@fortworthtexas.gov
Envelope ID: 101852191
Filing Code Description: Amended Filing
Filing Description: City of Fort Worth's Fourth Amended Petition in Intervention and Application for Temporary Restraining Order and Injunctive Relief
Status as of 6/10/2025 4:34 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Alexander JLindvall | | alexander.lindvall@arlingtontx.gov | 6/10/2025 3:41:10 PM | SENT |
| Joe DonBobbitt | | jdbobbitt@tad.org | 6/10/2025 3:41:10 PM | SENT |
| Joseph Nguyen | | joseph.nguyen@arlingtontx.gov | 6/10/2025 3:41:10 PM | SENT |
| Chandra Jackson | | chandra.jackson@fortworthtexas.gov | 6/10/2025 3:41:10 PM | SENT |
| Steve ACumbie | | stephen.cumbie@fortworthtexas.gov | 6/10/2025 3:41:10 PM | SENT |
| Christopher BMosley | | chris.mosley@fortworthtexas.gov | 6/10/2025 3:41:10 PM | SENT |
| Olyn Poole | | olyn.poole@fortworthtexas.gov | 6/10/2025 3:41:10 PM | SENT |
| THE CITY OF FORT WORTH | | Chandra.Jackson@fortworthtexas.gov | 6/10/2025 3:41:10 PM | SENT |
| THE A.CITY OF FORT WORTH | | stephen.cumbie@fortworthtexas.gov | 6/10/2025 3:41:10 PM | SENT |

# EXHIBIT D

CAUSE NO. 348-364430-25

| | | |
|---|---|---|
| CITY OF LAKE WORTH, TEXAS<br>*Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT COURT |
| **v.** | §<br>§<br>§ | |
| PLEASANTON HOUSING FINANCE<br>CORPORATION, a Texas nonprofit<br>corporation, THE TARRANT<br>APPRAISAL DISTRICT, and ISMAEL<br>GALLEGOS, JOEY MACON, MARK<br>PINKSTON, ZACHARY PAWELEK,<br>SCOTT FERGUSON, LILIAN<br>CASHMER, AND BRANDON HICKS,<br>in their official capacities as Board<br>Members of Pleasanton Housing<br>Finance Corporation,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 348th JUDICIAL DISTRICT<br><br><br><br><br><br>TARRANT COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED APPLICATION FOR TEMPORARY INJUNCTION AND RESPONSE TO DEFENDANT TARRANT COUNTY APPRAISAL DISTRICT'S PLEA TO THE JURISDICTION

**TO THE HONORABLE MEGAN FAHEY, JUDGE:**

The City of Lake Worth, Texas, ("Lake Worth") Plaintiff, files this its First Amended Application for Temporary Injunction and Response to Defendant Tarrant Appraisal District ("TAD")'s Plea to the Jurisdiction and in support of which, respectfully shows the Court the following:

### I.
### BACKGROUND

This case involves an abuse of the Texas Housing Finance Corporation Act, Tex. Local Gov't Code §§ 394.001 *et seq.* ("The Act"). Pleasanton Housing Finance Corporation ("Pleasanton HFC") – a housing corporation located in and created by a small town that is 300 miles away from the location of the property in question – seeks to obtain a full tax exemption on a large multi-family development located in the City of Lake Worth, Texas. Pleasanton HFC receives a

Plaintiff's First Amended Application for Temporary Injunction and
Response to Defendant TAD's Plea to the Jurisdiction                                                    PAGE 1

Copy from re:SearchTX

monetary kickback while causing the loss of millions of dollars in real property value from the local tax base.

Pleasanton HFC's scheme, which is in direct contravention of the Act, consists of the following machinations: a private developer acquires land for a new multifamily development (or acquires an already-existing multifamily development as in this case) in a city other than Pleasanton, Texas; the private developer then conveys that property to Pleasanton HFC; Pleasanton HFC, as the new owner, then applies for and receives a 100% tax exemption; and Pleasanton HFC then leases that now-exempt property to a private landlord (oftentimes the same developer who originally purchased the property), who then shares the profits with Pleasanton HFC. The upshot of this unethical and unlawful scheme is that the developer and landlord get a massive tax exemption, Pleasanton HFC gets to collect fees and a portion of the development's profits, and the other city (in this case, Lake Worth, Texas) bears 100% of the downside.

While the City supports the creation of affordable housing opportunities for its residents, which is a worthy mission, Pleasanton HFC improperly seeks to deprive the elected officials of Lake Worth, Texas – where these projects are located – from engaging in the critical cost-benefit analysis necessary to determine whether the public benefits of these multifamily housing projects are worth the elimination of tax revenues that are otherwise due to the local community. Further, the City is also deprived of any oversight over the multifamily housing project to include whether affordable housing is actually being provided to low-income tenants as required under the Act.

In short, a tiny housing finance corporation, located 300 miles away in a town with less than 13,000 residents, has singlehandedly reduced Lake Worth's yearly tax revenue by well over a quarter of a million dollars while it rakes in undeserved fees and profits from rental property located in Lake Worth. Further, the City bears all costs for providing services to the property at issue

Plaintiff's First Amended Application for Temporary Injunction and
Response to Defendant TAD's Plea to the Jurisdiction                                              PAGE 2

Copy from re:SearchTX

while Pleasanton HFC obtains the financial windfall. The City of Pleasanton then unlawfully diverts its ill-gotten gains to its general fund rather than use these funds for providing affordable housing services for its own residents in violation of the Act. Accordingly, the City now brings this lawsuit to enforce its statutory rights under Chapter 394 of the Texas Local Government Code. The City also seeks injunctive relief to stop Pleasanton HFC's and its Board members' unlawful behavior before they do any further irreversible damage to Lake Worth's tax base, and to stop the Tarrant Appraisal District ("TAD") from granting tax exemptions requested by Pleasanton HFC regarding properties located in Lake Worth, Texas.

**II.**
**FIRST AMENDED APPLICATION FOR TEMPORARY INJUNCTION**

The City respectfully requests that this Court enter a temporary injunction order that prohibits (1) the Pleasanton HFC Defendants from purchasing additional property in the City of Lake Worth and (2) all Defendants from requesting, obtaining, granting, or receiving tax-exemptions for property located in the City of Lake Worth. In support, the City shows the following.

**A.     The Texas Housing Finance Corporations Act.**

The Texas Housing Finance Corporations Act ("the Act") found in Chapter 394 of the Texas Local Government Code was passed in 1979 to help facilitate the development of low and moderate income housing. Tex. Local Gov't Code §§ 394.001 *et seq.*; see also Tex. Local Gov't Code § 394.002(a) (the Act's purpose is to "provide a means to finance the cost of residential ownership and development that will provide decent, safe, and sanitary housing at affordable prices for residents of local governments").

To help create more low and moderate income housing, the Act empowers local governments to create Housing Finance Corporations ("HFCs")—nonprofit organizations,

Copy from re:SearchTX

comprised of local officials, that help coordinate and facilitate affordable housing projects. *See* Tex. Local Gov't Code §§ 394.002, 394.011(a), 394.032. And because HFCs are (at least in theory) furthering a public purpose, the Act provides that HFC-owned properties and the income derived from those properties are tax-exempt. Tex. Local Gov't Code § 394.905 ("The housing finance corporation, all property owned by it, the income from the property, all bonds issued by it, the income from the bonds, and the transfer of the bonds are exempt, as public property used for public purposes, from license fees, recording fees, and all other taxes imposed by this state or any political subdivision of this state.").

HFCs are commonly a part of public/private real estate partnerships, in which a private developer acquires land for a new development or acquires an existing multifamily project and then conveys it to an HFC, which then acquires tax-exempt status for the property and leases the property to a private landlord who, in turn, pays fees to the HFC and shares the profits generated by the property with the HFC. Because the Act allows for such an enormous tax benefit, it provides two specific restrictions on what residential developments an HFC can tax-exempt: (1) a residential development can receive tax exemption from an HFC only if at least 90% of the development "is for use by or is intended to be occupied by persons of low and moderate income," as defined by the statute, Tex. Local Gov't Code § 394.004; and (2) the residential development "must be *located within the local government*." Tex. Local Gov't Code § 394.903 (emphasis added).

An HFC, in other words, can obtain tax-exempt status for a residential development only if the development is located within the HFC's local jurisdiction and is actually used to house low or moderate income individuals. Tex. Local Gov't Code §§ 394.004, 394.903. Here, Pleasanton HFC has not complied with either mandatory requirement for tax-exemption.

Copy from re:SearchTX

**B.     The Formation of Pleasanton HFC.**

Pleasanton HFC is a governmental entity formed under the authority of the Act for the purposes of financing and promoting affordable housing.   According to Pleasanton HFC's Certificate of Formation filed with the Texas Secretary of State, a copy of which is attached as **Exhibit 1**, Pleasanton HFC was incorporated by the City of Pleasanton, Texas in 2023.   [Exhibit 1].   Pleasanton HFC is governed by a Board of Directors, in which all the powers of the HFC  are vested.   Tex. Loc. Gov't Code § 394.021.   A majority of the directors constitutes a quorum.   Id.  The directors may take action by a majority vote when a quorum is present. Id.   Per the Restated Certificate of Formation filed with the Texas Secretary of State, a copy of which is attached as **Exhibit 2**, the Board of Pleasanton HFC is comprised of the members of the governing body of the City of Pleasanton, Texas. [Exhibit 2, Art. VII, p. 3].   Accordingly, the current board members are: Ismael Gallegos; Joey Macon; Mark Pinkston; Zachary Pawelek; Scott Ferguson; Lilian Cashmer; and Brandon Hicks.

**C.     Pleasanton HFC is exempting properties in Lake Worth—300 miles outside its jurisdiction—without complying with the 90%-income-threshold under the Act.**

As set forth in the affidavit of City Manager Stacey Almond, a copy of which is attached as **Exhibit 3**, Pleasanton HFC recently acquired Neuhaus Lake Worth Apartments, located at 6201 Azle Ave., Lake Worth, Texas 76135 – an already-built, upscale apartment complex located in Lake Worth. [Exhibit 3 at ¶ 2]. The legal description of this property follows:

> Lot 1, Block 1, of FDG-POH LAKE WORTH JV ADDITION, LOT 1, BLOCK 1, a subdivision to the City of Lake Worth, Tarrant County, Texas, according to the Plat thereof recorded in cc# D225063225, Real Property Records, Tarrant County, Texas.

[Exhibit 3 at ¶ 2].   Upon information and belief, Pleasanton HFC has applied for a full tax-exemption for this property, which is currently being processed by TAD.  [Exhibit 3 at ¶ 2].   Upon

Copy from re:SearchTX

information and belief, after receiving that exemption, Pleasanton HFC will lease the complex to a private landlord and collect a share of that complex's profits.

However, Neuhaus Lake Worth Apartments is not entitled to tax-exemption. Upon information and belief, Neuhaus Lake Worth Apartments does not lease 90% of its available units to persons of low and moderate income. With fees and rent, a three-bedroom apartment in this complex costs over $2,000 per month, and a two-bedroom is only slightly less expensive.[1] Further, Neuhaus Lake Worth Apartments provides no information on its website about affordable housing or income requirements. Id. This complex also does not meet the 90%-income-housing threshold needed to receive an exemption under the Act. See Tex. Local Gov't Code § 394.004 (providing that a residential development can receive tax exemption from an HFC only if at least 90% of the development "is for use by or is intended to be occupied by persons of low and moderate income").

Additionally, it appears that Pleasanton is utilizing the profits earned from this unethical and unlawful scheme to offset utility rate increases and to supplement city operations via its General Fund. However, Section 394.032(b) of the Act limits any net corporate earnings to provide housing for low to moderate income individuals:

> Sec. 394.023. DISPOSITION OF CORPORATE EARNINGS.
> (a) The housing finance corporation may not pay dividends. The net earnings of the corporation may not be distributed to or benefit the directors or officers of the corporation or any person except as reasonable compensation for services rendered to the corporation.
> (b) If the board of directors determines that sufficient provision has been made for full payment of the expenses, bonds, and other obligations of the corporation, any net corporate earnings accruing after the determination shall be paid to the local government. **The local government shall use amounts received under this subsection only to provide for the housing needs of individuals and families of low and moderate incomes, including single-family units and mixed income multifamily projects found by the local government to serve the interests of low and moderate income individuals and families if the single-family and multifamily projects have as a major**

---

[1] https://www.neuhauslakeworth.com/models

Copy from re:SearchTX

> **purpose the provision of safe, sanitary, and decent housing for individuals and families of low income**.
>
> (c) This section does not prohibit the board of directors from transferring corporate property as provided by a contract made by the corporation.

Tex. Loc. Gov't Code § 394.023 (emphasis supplied). Indeed, Pleasanton City Manager Johnny Huizar has admitted to the Pleasanton Express that Pleasanton HFC's revenue is transferred to the City of Pleasanton's general fund as needed. See Daniel Elizondo, *Massive tax breaks, major scrutiny: Pleasanton housing project under statewide spotlight,* Pleasanton Express, April 2, 2025, a copy of which is attached as **Exhibit 5**. According to Huizar, Pleasanton HFC's funds were recently used to support a five-year freeze on water rate hikes following a city council resolution. [Exhibit 5, p. 8]. Defendant Hicks has previously stated that Pleasanton HFC reaps $300,000 from each closed deal, some of which was spent on "back pay" for the Pleasanton City Manager and City Secretary. [Exhibit 5, p. 7]. It seems that Pleasanton HFC's revenue, which is generated by decimating other municipalities' tax rolls, is not being used to only provide for the housing needs of individuals and families of low and moderate income as mandated by the Act.

Additionally, the City has been damaged as a result of Defendants' actions. Specifically, Pleasanton HFC's illegal tax-exemption scheme has removed millions of dollars from Tarrant County taxing units' tax rolls. The 2025 appraised value for this property is $54,925,097, as set forth in TAD records, attached hereto as **Exhibit 4**. [Exhibit 4, p. 2]. Consequently, the Property's tax-exempt status has resulted in tax revenue loss to the following taxing units: The City of Lake Worth; Tarrant County; Tarrant County Hospital; Tarrant County College; and Lake Worth ISD. [Exhibit 3 at ¶ 5]. These taxing units will lose a total of $1,220,931 in tax revenue in 2025. [Exhibit 3 at ¶ 5]. Lake Worth ISD alone will lose $689,420 in annual tax revenue as a result of Pleasanton HFC's improper claim of tax-exempt status on the Neuhaus Lake Worth apartment complex. [Exhibit 3 at ¶ 5].

Copy from re:SearchTX

In regards to the City, it will lose $266,618.00 in estimated tax revenue in 2025, based upon the appraised value of the property and the City's adopted tax rate of .485420/$100. [Exhibit 3 at ¶¶ 4, 6]. In other words, by improperly exempting just one apartment complex in Lake Worth, Texas, Pleasanton HFC will cause Lake Worth to lose over a quarter of a million dollars annually, in tax revenue, and there is no clear path for Lake Worth (or other affected local entities) to recoup that loss. [Exhibit 3 at ¶ 4]. This equals an estimated 7.02% of Lake Worth's annual ad valorem tax revenue. [Exhibit 3 at ¶ 4]. Yet the City still incurs the cost of providing essential public services to the property, including police, fire protection, code enforcement, street maintenance, etc.; while Pleasanton HFC, an absent landlord, reaps all financial benefits.

This is a widespread problem across the state. The City of Euless, for example, has seen at least a 2% drop in its overall annual revenue after a *single* apartment complex received tax-exempt status from the Cameron County HFC.[2] Dallas, Fort Worth, McKinney, Irving, Lewisville, and other north Texas cities have reported millions of dollars in total lost tax revenue.[3] Typically, these out-of-jurisdiction HFCs are often bestowing tax-exempt status to already-built structures (not new projects), and many of the exempted properties are not even affordable housing projects; they are typical for-profit apartments and condos, usually located in upmarket neighborhoods, that do not offer reduced rent, housing vouchers, or other benefits to low-income applicants.[4]

---

[2] Andrea Lucia, *Euless Loses 2 Percent of Revenue to Controversial Tax Break Approved in Faraway County*, CBS News (Feb. 21, 2024) available at https://www.cbsnews.com/texas/news/euless-loses-2-percent-of-revenue-to-controversial-tax-break-approved-in-faraway-county/.

[3] Andrea Lucia, *Housing Group Made Millions Getting Tax Breaks for Developers, Costing Cities and Schools Even More*, CBS News (Dec. 22, 2023) available at https://www.cbsnews.com/texas/news/housing-group-made-millions-getting-tax-breaks-for-developers-costing-cities-and-schools-even-more/.

[4] *Id.* (documenting that an out-of-town HFC purchased an apartment complex in a "luxurious community" in Irving and that the tenants' rents went *up* significantly under the HFC's ownership).

Copy from re:SearchTX

Because of the widespread nature of this practice, there has been a strong legislative push to (even more) explicitly outlaw this sort of tax-exemption scheme. See H.B. No. 21.[5] Upon information and belief, because the Legislature intends to take strong action to prevent these illegal schemes, HFCs, such as Pleasanton HFC, are scrambling to acquire multiple out-of-jurisdiction projects.

**D.     A Temporary Injunction is Necessary to Maintain the Status Quo, and to Prevent Continued Unlawful Action, because the City Has a Probable Right to Relief and Is Faced with Imminent Irreparable Harm.**

To stop Pleasanton HFC from closing on the purchase of any more properties located in Lake Worth, Texas, the City asks this Court for a temporary injunction that prohibits Pleasanton HFC from (a) closing on the purchase of any properties located in the City of Lake Worth and (b) requesting, approving and/or obtaining any tax exemptions on Lake Worth properties. The City further requests a temporary injunction that prohibits Tarrant Appraisal District from granting tax exemptions requested by Pleasanton HFC regarding any properties located in the City of Lake Worth, Texas, to include the currently pending application for tax exemption for Neuhaus Lake Worth Apartments.   "To obtain a temporary injunction, [an] applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) probable, imminent, and irreparable injury in the interim."   *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "Whether to grant or deny a temporary injunction is within the trial court's sound discretion," and an order granting injunctive relief will be reversed on appeal only if "the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Id.*  An applicant has a probable right to relief if it has a cause of action for which relief may be granted. *Universal Health Services, Inc. v. Thompson,* 24 S.W.3d 570, 577-78 (Tex.

---

[5] https://legiscan.com/TX/text/HB21/id/3053018.

Copy from re:SearchTX

App.-Austin 2008, no pet.). Among other grounds, "[a] trial court may . . . grant injunctive relief … when a dispute involves real property." *Shor v. Pelican Oil & Gas Mgmt.,* LLC, 405 S.W.3d 737, 750 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

All these elements are present. The City has pled a cause of action against Defendants: namely a declaratory action under the UDJA, an *ultra vires* claim against Pleasanton HFC board members, and a violation of the Texas Constitution. The City has shown it will likely be successful in this declaratory action, as the Act's plain language prohibits Pleasanton HFC's complained-of conduct. And, in the absence of injunctive relief, Pleasanton HFC will continue to pursue its application for tax exemption and TAD will grant Pleasanton HFC's application for tax exemption on the Neuhaus Lake Worth property and Pleasanton HFC is likely to close on the purchase of additional Lake Worth properties and apply for tax exemptions on those properties as well. Such actions would lead to an irreversible removal of those properties from the local tax rolls. Simply put, this is precisely the sort of case in which equitable relief is warranted.

### The City has a probable right to relief against the Pleasanton HFC Defendants.

As detailed in the City's Original Petition, the City has well-supported causes of action against Pleasanton HFC, and its board members, to establish and protect its rights in accordance with the Act and the Texas Constitution. Specifically, the City has brought a declaratory judgment action against the Pleasanton HFC Defendants pursuant to Civ. Prac. & Rem. Code § 37.003, regarding their violation of Texas Local Gov't Code Sections 394.903(a). (Original Petition, pp. 12-13). Specifically, Pleasanton HFC's scheme to obtain properties outside the jurisdictional limits of Pleasanton, Texas, runs afoul of the plain language of Section 394.903(a) of the Act, which states "[a] residential development covered by this chapter *must be located within the local government,*" Id. (emphasis supplied). Texas courts "interpret statutes by looking to their plain

Copy from re:SearchTX

language and construing the text in light of the statute as a whole." *City of Austin v. Quinlan*, 669 S.W.3rd 813, 821 (Tex. 2023). In order to give effect to the Legislature's intent, Courts "enforce the plain meaning of statutory text, informed by its context." *Hegar v Health Care Serv. Corp.*, 652 S.W. 3rd 39, 43 (Tex. 2022).

In the context of Chapter 394 as a whole, "local government" in this case means the local government sponsor of the HFC, i.e. the City of Pleasanton, Texas. For example, sections 394.055(c) and 394.055(d) of the Act both use the phrase "the state, the local government, or any other municipality, county, or other municipal or political corporation or subdivision of the state." To replace the words "the local government" with "any municipality or county" in these clauses renders the phrase redundant. Section 394.902 uses the phrase "the governing body *of the local government that authorizes, sponsors, or otherwise participates in the creation of the housing finance corporation* shall cooperate…." (emphasis added). The plain reading of the use of "local government" throughout Chapter 394 further emphasizes the point that the Legislature meant the local government sponsor of the HFC when it used the phrase "the local government." Accordingly, Chapter 394 is limited by its plain language to residential developments located within the jurisdiction of the sponsoring local government. As such, Pleasanton HFC cannot legally purchase, develop, and grant tax-exemptions for residential developments, such as Neuhaus Lake Worth Apartments, which are outside its jurisdictional boundaries.

The case of *Walker v. U.S. Dep't of Housing & Urban Dev.*, 326 F.Supp. 2d 773, 777 (N.D. Tex. 2004) is instructive. There, the United States District Court for the Northern District of Texas held that:

> § 394.903(a), which applies to residential development by public facility corporations via § 394.004, restricts residential development to locations within the local government. "Local government" refers to any municipality or county, and in

Copy from re:SearchTX

the context of a public facility corporation created by a housing authority, the housing authority's jurisdiction serves as an appropriate proxy for the limitation.

*Id.* at 477. Thus, the Court concluded that Section 394.903(a) restricts residential development to locations within the housing authority's jurisdiction. It would be absurd for the Act to allow an HFC created by one municipality to own and lease property in another municipality. Such a perverse scheme would allow a small town like Pleasanton, Texas to make decisions regarding real property located in another municipality, which results in the other municipality (Lake Worth) losing 100% of the ad valorem tax value from the property. Pleasanton HFC has no ability to weigh that significant financial loss against the potential benefits of the project to the community, *which directly affects the residents of the City of Lake Worth in a detrimental way.* Meanwhile, the traveling, out-of-jurisdiction HFC reaps a purely monetary windfall without any incentive for oversight by its sponsoring municipality, whose own tax revenues remain unaffected. Moreover, the underlying public purpose of the Act to provide for the creation of affordable housing by local housing authorities goes unserved within the jurisdiction of the local government that sponsored the housing finance corporation.

In the alternative, to the extent Pleasanton HFC takes the position that, contrary to its plain language, the Act ***does not*** prohibit it from acquiring and seeking tax exemptions for properties in Tarrant County, ***and*** to the extent Pleasanton HFC prevails in such interpretation of the Act, the City alternatively requests a declaration from the Court that Pleasanton HFC's actions violate the Texas Constitution's rules against extra-jurisdictional taxation by seeking to impose a system of taxation on properties located outside of the boundaries of Atascosa County, Texas where the City of Pleasanton is located. The Texas Constitution requires that all property shall be assessed for taxation in the county where it is located. Tex. Const. Art. art. VIII, § 11. Specifically, a county's ad valorem taxation authority is limited to "property within their respective boundaries." Tex.

Copy from re:SearchTX

Const. Art. VIII,. § 1-a. If the Act could be read to empower Pleasanton HFC to take properties outside of Atascosa County off of the tax rolls of other counties in Texas, this would violate the Texas Constitution's limits on the scope of Texas counties' taxing authority. (Original Petition, p. 15).

Accordingly, the City has meritorious claims against the HFC Pleasanton Defendants and seeks temporary injunctive relief prohibiting the Pleasanton HFC Defendants from purchasing or developing residential property in the City of Lake Worth and from requesting, obtaining, or bestowing tax exemptions on real property located in Lake Worth, Texas.

#### The City has a probable right to relief against the Pleasanton HFC board members.

Additionally, the City has brought a meritorious *ultra vires* claim against Defendants Ismael Gallegos, Joey Macon, Mark Pinkston, Zachary Pawelek, Scott Ferguson, Lilian Cashmer, and Brandon Hicks, in their role as Pleasanton HFC board members, for their approval of the illegal purchase and development of residential properties located in Lake Worth and the application for tax-exempt status for same. (Original Petition, p. 15). "The *ultra vires* doctrine applies when a government official's conduct is without legal or statutory authority." *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 9 (Tex. 2015). Parties may obtain prospective declaratory and injunctive relief when an official: a) fails to perform a ministerial act; or b) acts without legal authority. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009). Here, the City requests prospective declaratory and injunctive relief to stop Pleasanton HFC from engaging in residential development outside the geographic boundaries of the local government that formed it, the City of Pleasanton, Texas. As discussed *supra*, residential development by Pleasanton HFC is limited to the jurisdictional boundaries of the City of Pleasanton pursuant to Section 394.903(a). Because Pleasanton HFC acts through its Board of Directors, Plaintiff

Copy from re:SearchTX

requests relief to prevent the *ultra vires* acts of the Board of Directors in acting without authority under Chapter 394 by applying it to the property at issue, to include declaratory and injunctive relief set forth herein.

## The City has a probable right to relief against TAD.

The City also has a meritorious cause of action against TAD. The Texas Tax Code allows a taxing unit to sue an appraisal district that appraises property for the unit to compel the appraisal district to comply with the provisions of [the Property Tax Code], rules of the comptroller, or other applicable law. *See* Texas Tax Code § 43.01. The City is a taxing unit for the property at issue, which was appraised by Tarrant Appraisal District. Accordingly, the City asks for a declaratory judgment from this Court declaring the Act does not allow Pleasanton HFC to purchase, develop, or to request, obtain, or bestow tax exemptions on real property located in Lake Worth, Texas. Accordingly, TAD cannot grant a full tax exemption to Neuhaus Lake Worth Apartments, or any other real property owned by Pleasanton HFC that is located in Lake Worth, Texas. (Original Petition pp. 14-15). TAD's claim that it is entitled to governmental immunity and that the City was required to exhaust its administrative remedies, is addressed in Section III. below.

## In the absence of a temporary injunction, the City will suffer irreparable injury.

In the absence of such relief, the City will suffer irreparable injury for which no remedy at law exists without the protections of a temporary restraining order and injunctive relief. Pleasanton HFC, like many traveling, out-of-jurisdiction HFCs, is rushing to acquire properties outside its jurisdiction in a nefarious attempt to develop as many properties outside its jurisdictional limits as possible before its misuse of the Act is stopped. As reported by the Pleasanton Express, Pleasanton HFC's financial attorney, Carey Troell, indicated that the opportunity to finalize deals may soon close as legislation moves forward. [Exhibit 5, p. 6]. A

Copy from re:SearchTX

temporary injunction will prevent this unlawful behavior from occurring, maintain the status quo, and will not unduly prejudice Defendants in the short-term. Further, a temporary injunction is necessary to prevent the Tarrant Appraisal District from granting tax exemptions requested by Pleasanton HFC regarding any real property located in Lake Worth. Pleasanton HFC has applied to TAD for tax exemption on the Neuhaus Lake Worth Apartments.

If its tactics are permitted with respect to the Neuhaus Lake Worth Apartments, the City, along with Lake Worth ISD and other local governmental units, will face the dire consequence of losing millions of dollars in ad valorem tax revenue. The removal of this property from the tax rolls would immediately affect the City's budgeting, thereby necessarily preventing the City from allocating that lost revenue to be used for public services. The impact of this lost revenue on Lake Worth ISD is over half a million dollars a year. Likewise, the City will lose over a quarter of a million dollars in tax revenue each year, which totals an estimated 7.02% of its total annual tax revenue. Indeed, as reported by the Pleasanton Express, when questioned about the ethics and impact of Pleasanton HFC's scheme, Defendant Brandon Hicks responded, "[w]hen it comes back to taking revenue from other communities, I can see how people will see that as a bad thing. I think there should be better safeguards in place for when an HFC purchases a unit that is already existing and to make sure that those affordable guidelines are in place after the new developer takes over to make sure they're abiding by it." [Exhibit 5, pp. 2-3]. Nonetheless, despite the admitted impact on other municipalities, Pleasanton HFC has acquired 68 properties in jurisdictions outside the city limits of the City of Pleasanton. [Exhibit 5, p. 5].

### III.
### RESPONSE TO DEFENDANTS' PLEA TO THE JURISDICTION

TAD has filed a Plea to the Jurisdiction that argues (1) TAD has governmental immunity from suits brought pursuant to the Declaratory Judgments Act; and (2) that the City failed to

Copy from re:SearchTX

exhaust administrative remedies pursuant to the Texas Tax Code regulatory scheme. It is anticipated that the Pleasanton HFC Defendants will also raise the latter argument via a plea to jurisdiction in the near future. However, both of TAD's arguments should be rejected for the following reasons.

## A. TAD Does Not Have Immunity as Section 43.01 of the Texas Tax Code Is an Express Waiver of Governmental Immunity.

TAD correctly argues that governmental immunity bars declaratory judgment actions against the state and its political divisions absent a legislative waiver. See Tex. Tax Code § 6.01(c) ("An appraisal district is a political subdivision of the state."); *Falls Cty. Appraisal Dist. v. Burns*, No. 10-21-00019-CV, 2022 Tex. App. LEXIS 1895 (Tex.App.—Waco, March 23, 2022, pet. den'd). "UDJA claims requesting other types of declaratory relief are barred absent a legislative waiver of immunity with respect to the underlying action." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 553 (Tex. 2019). In support, TAD also cites to the cases of *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) and *Stiefer v. Moers*, No. 14-14-00617-CV, 2015 WL 6950104, at *3 (Tex. App.—Houston [14th Dist. Nov. 10, 2015, no pet.) (mem. op.), which are discussed in more detail below.

However, TAD ignores the plain language of Section 43.01 of the Texas Property Code, which contains an express waiver of TAD's governmental immunity. Section 43.01 states that "[a] taxing unit may sue the appraisal district that appraises property for the unit to compel the appraisal district to comply with the provisions of this title, rules of the comptroller, *or other applicable law*." Tex. Tax Code § 43.01 (emphasis added). The plain language of this section permits a taxing unit to sue an appraisal district. *See Ashland Inc. v. Harris Cnty Appraisal Dist.*, 437 S.W.3d 50, 52-53 (Tex.App.—Houston [14th Dist.] 2014, pet. den'd) ("If a statute is worded clearly, we must honor its plain language, unless that interpretation would lead to absurd results."); *City of*

Copy from re:SearchTX

*Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 57 (Tex. 2015) ("As a general principle, we eschew construction of a statute that render any statutory language meaningless or superfluous."). Those cases cited by TAD do not address the application of Section 43.01. *City of El Paso v. Heinrich* involved a suit by a widow seeking to collect monies from the El Paso Fireman & Policemen's Pension Fund. *See City of El Paso,* 284 S.W.3d at 369. *Stiefer v. Moers*, an unpublished case, also did not address whether Section 43.01 waived governmental immunity, and instead held that Section 41.45(f) did not waive a chief appraisal officer's entitlement to governmental immunity. *Stiefer*, No. 14-14-00617-CV at *11-13 (holding that pursuant to the plain language of Section 41.45(f), while the property owners are entitled to file a petition against the appraisal review board to compel a hearing, this section does not permit suit against a chief appraisal officer). Courtesy copies of both opinions are included in the attached appendix.

However, those courts that have analyzed Section 43.01 have found that it waives an appraisal board's governmental immunity. In *Blue Cactus Post, L.C. v. Dallas County Appraisal District*, 229 B.R. 379 (N.D.Tex. Bank. 1999), the district bankruptcy court concluded that the language of section 43.01 weighed against a finding of Eleventh Amendment (sovereign) immunity:

**5. The DCAD's capacity to sue and be sued**

The DCAD may, and in some instances must, be sued in its own name. Further, as provided in the Property Tax Code, "a taxing unit may sue the appraisal district that appraises property for the unit to compel the appraisal district to comply with the provisions of [the Property Tax Code], rules of the State Property Tax Board, or other applicable law." Therefore, this factor weighs against a finding of Eleventh Amendment immunity for the DCAD.

*Id*. at 385. It logically follows that the plain language of section 43.01 also weighs against any finding of *governmental immunity* under Texas law. *See City of Cleburne v. Cent. Appraisal Dist. of Johnson County*, No. 10-02-00154-CV, 2004 Tex. App. LEXIS 6088 (Tex.App.—Waco, July

Copy from re:SearchTX

7, 2004). In *City of Cleburne,* the Waco Court of Appeals reversed the granting of the Appraisal

District's plea to the jurisdiction, holding that "Article 43.01 of the Tax Code authorizes the City

to sue the Appraisal District to compel it to comply with the Code." *Id*. at *4.

> The City has asserted a claim against the District to compel compliance with the
> Tax Code, a claim against the Board to prevent enforcement of an order claimed to
> be void, and a claim against Cobblestone as a party whose rights would be affected
> by the judgment. Without regard to whether the claims have merit, we believe that
> the district court had jurisdiction over them. We reverse the trial court's Order of
> Dismissal and remand the cause for further proceedings.

*Id.* Courtesy copies of these opinions are also included in the attached appendix.

Based upon the persuasive authority of the opinions in *Blue Cactus* and *City of Cleburne*

and the plain language of Section 43.10, the City respectfully submits that TAD does not have

governmental immunity pursuant to Section 43.01 of the Texas Tax Code, this Court has

jurisdiction over the instant action, and TAD's plea to the jurisdiction should be denied.

**B.      The City is Not Required to Exhaust Administrative Remedies Pursuant to the
Texas Tax Code.**

TAD also claims that any claims brought pursuant to the Declaratory Judgments Act are

barred because the administrative provisions of the Texas Property Code are the exclusive means

for parties to solve disputes in connection with the Texas Property Code.   In support of its

administrative exhaustion argument, TAD cites to Tex. Tax Code § 42.09, which states:

> Sec. 42.09.  REMEDIES EXCLUSIVE.
>
> (a) Except as provided by Subsection (b) of this section, procedures
> prescribed by this title for adjudication of the grounds of protest authorized by this
> title are exclusive, and a property owner may not raise any of those grounds:
>
> > (1) In defense to a suit to enforce collection of delinquent taxes; or
>
> > (2) As a basis of a claim for relief in a suit by the property owner to
> arrest or prevent the tax collection process or to obtain a refund of taxes paid.

Copy from re:SearchTX

(b) A person against whom a suit to collect a delinquent property tax is filed may plead as an affirmative defense:

   (1) If the suit is to enforce personal liability for the tax, that the defendant did not own the property on which the tax was imposed on January 1 of the year for which the tax was imposed;

   (2) If the suit is to foreclose a lien securing the payment of a tax on real property, that the property was not located within the boundaries of the taxing unit seeking to foreclose the lien on January 1 of the year for which the tax was imposed.

   (c) For purposes of this section, "suit" includes a counterclaim, cross-claim, or other claim filed in the course of a lawsuit.

Tex. Tax Code § 42.09.   The municipalities are not taxpayers protesting appraisals, and this exclusive remedy statute does not apply.   Taxing units such as municipalities are generally excluded from the appraisal process, with the exception of the right to appeal "in limited circumstances" pursuant to Section 41.03. *Iraan-Sheffield Indep. Sch. Dist. v.. Kinder Morgan Prod. Co., LLC*, 657 S.W.3rd 525, 534 (Tex.App.—El Paso 2022, pet. den'd).

Indeed, Section 41.03 of the Texas Tax Code limits the right of appeal by a taxing unit to the following:

Section 41.03 Challenge by Taxing Unit.

(a) A taxing unit is entitled to challenge before the appraisal board:
   (1) an exclusion of property from the appraisal records;
   (2) a grant in whole or part *of a partial exemption*, other than an exemption under Section 11.35;
   (3) a determination that land qualified for appraisal as provided by Subchapter C, D, E, or H, Chapter 23; or
   (4) a failure to identify the taxing unit as one in which a particular property is taxable.

Tex. Tax Code § 41.03(a) (emphasis supplied).  None of which are applicable to a municipality's challenge to the granting of a full tax exemption in violation of the Texas Housing Finance Corporations Act.  Additionally, since Pleasanton HFC's application for full tax exemption is currently pending, there is nothing for the City to appeal to the appraisal board.

Copy from re:SearchTX

In any event, those cases upon which TAD relies in its Plea to the Jurisdiction are inapposite. *See In re ExxonMobil Corp.*, 153 S.W.3d 605, 614 (Tex.App.—Amarillo 2004, orig. proceeding); *Vexler v. Spencer*, No. 02-24-00305-CV, 2025 Tex. App. LEXIS 3060, at *8-9 (Tex.App.—Fort Worth, May 1, 2025, no pet. h.) (mem. op.); and *Fort Worth v. Pastusek Indus., Inc.*, 48 S.W.3d 366, 370-371 (Tex.App.—Fort Worth 2001, no pet.). *In re ExxonMobil Corp.* involved litigation filed by a taxing unit, arising from the "exclusion of property from appraisal records" as set forth in Section 41.03 of the Tax Code. *In re ExxonMobil Corp.*, 153 S.W.3d at 613-614 (concluding that fraud claim against oil companies regarding fraudulent undervaluing of mineral interest in property constituted property omitted from the appraisal roll). Both *Vexler* and *Pastusek* arose from a property owner's suit to recover excessive taxes collected and the exclusive remedy for "protests initiated by property owners" as set forth in Tex. Tax Code §§ 41.01(a)(1), 41.44(a), and 41.41. *Vexler*, 2025 Tex. App. LEXIS 3060 at *8; *Pastusek Indus.*, 48 S.W.3d at 369.

In contrast, litigation challenging the traveling HFC scheme and subsequent full tax exemptions does not implicate the grounds for appeal under Section 41.03, nor does it arise in connection with the Texas Property Code. Instead, this litigation focuses upon the interpretation and application of the Housing Finance Corporations Act, Chapter 394 of the Texas Local Government Code. A district court's jurisdiction "consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex. 2000) (citing Tex. Const. art. V, § 8). A district court "may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either

Copy from re:SearchTX

courts of law or equity." Tex. Gov't Code Ann. § 24.008. For "courts of general jurisdiction . . . the presumption is that they have subject matter jurisdiction unless a showing can be made to the contrary." *Dubai Petroleum*, 12 S.W.3d at 75.

Pursuant to the plain language of Section 41.03 of the Tax Code, the appraisal review board does not have exclusive jurisdiction over a claim that the Housing Finance Corporations Act precludes granting a full tax exemption to a property obtained by a traveling HFC. *In re ExxonMobil Corp.*, 153 S.W.3d at 615 (". . . in an analysis of a claim of exclusive administrative agency jurisdiction, the administrative body is limited to the powers clearly and expressly given it and courts will not imply additional agency authority."); *accord Jim Wells County v. El Paso Prod. Oil & Gas*, 189 S.W.3d 861, 870 (Tex.App.—Houston [1st Dist] 2006, pet. den'd) (Pursuant to the Tax Code, a "pervasive regulatory scheme" vests the Board with exclusive original jurisdiction *over tax appraisal protests*.")(emphasis added). Moreover, Section 43.01 of the Texas Tax Code expressly provides that "[a] taxing unit may sue an appraisal district that appraised property for the taxing unit to compel compliance with . . . other applicable law." Tex. Tax Code § 43.01.

## IV.
## PRAYER FOR RELIEF

For these reasons, the City respectfully requests that this Court deny Defendant Tarrant Appraisal District's Plea to the Jurisdiction and grant Plaintiff's application for temporary injunction that:

1. Prohibits Pleasanton Housing Finance Corporation and Defendant Board Members Ismael Gallegos, Joey Macon, Mark Pinkston, Zachary Pawelek, Scott Ferguson, Lilian Cashmer, and Brandon Hicks from purchasing or approving the purchase of real property located in the City of Lake Worth, Texas;

2. Prohibits Pleasanton Housing Finance Corporation and Defendant Board Members Ismael Gallegos, Joey Macon, Mark Pinkston, Zachary Pawelek, Scott Ferguson, Lilian Cashmer, and Brandon Hicks from requesting, approving, or obtaining tax exemptions for any real property located in the City of Lake Worth, Texas; and

Copy from re:SearchTX

3. Prohibits the Tarrant Appraisal District from granting tax exemptions requested by Pleasanton HFC regarding any real property located in the City of Lake Worth, Texas.

Respectfully submitted,

/s/ Tammy Ardolf
Wayne K. Olson
Texas Bar No. 15276900
Email: wolson@toase.com

Tammy Ardolf
Texas Bar No. 90001536
Email: tardolf@toase.com

Marc A. Cavazos
Texas Bar No. 24128683
Email: mcavazos@toase.com

Members of the Firm of:
TAYLOR, OLSON, ADKINS, SRALLA,
& ELAM, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107-3654
Telephone: 817.332.2580
Facsimile: 817.332.4740

**ATTORNEYS FOR PLAINTIFF**
**CITY OF LAKE WORTH, TEXAS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served on all parties, in accordance with the Texas Rules of Civil Procedure, on this 22nd day of May, 2025.

/s/ Tammy Ardolf
Tammy Ardolf

Copy from re:SearchTX

## VERIFICATION

| | | |
|---|---|---|
| **STATE OF TEXAS** | | § |
| | | § |
| **TARRANT COUNTY** | | § |

BEFORE ME, the undersigned authority, on this day personally appeared Stacey Almond, who, is over the age of eighteen (18) years; of sound mind and suffers from no legal disabilities; is fully competent; and after being duly sworn, stated under oath that she is the City Manager and authorized representative of the City of Lake Worth; that she has read the above First Amended Application for Temporary Injunction; that every statement contained in Section II. of above is within her personal knowledge and is true and correct; and that she executed the same for the purposes, and in the capacity, therein expressed.

SIGNED this 22 day of May, 2025.

Signature: _____

Stacey Almond, City Manager

SWORN AND SUBSCRIBED TO BEFORE ME, the undersigned Notary Public on this 22 day of May, 2025.

_____
Notary Public

8/31/2027
My Commission Expires: _____

HOLLY FIMBRES
My Notary ID # 125827088
Expires August 31, 2027

Copy from re:SearchTX

# EXHIBIT E

Filed
5/27/2025 11:05 AM
**Beverley McGrew Walker**
District Clerk
Fort Bend County, Texas
Norma Sosa

## CAUSE NO. 25-DCV-328899

| | | |
|---|---|---|
| **CITY OF MISSOURI CITY, TEXAS & SIENNA PARKS & LEVEE IMPROVEMENT DISTRICT,** | § § § § § | **IN THE DISTRICT COURT OF** |
| *Plaintiffs,* | § § | |
| **vs.** | § § | **FORT BEND COUNTY, TEXAS** |
| **PLEASANTON HOUSING FINANCE CORPORATION AND THE BOARD MEMBERS OF THE PLEASANTON HOUSING FINANCE CORPORATION, IN THEIR OFFICIAL CAPACITIES,** | § § § § § § § § | |
| *Defendants.* | § | **240TH JUDICIAL DISTRICT** |

### CITY OF MISSOURI CITY & SIENNA PARKS & LEVEE IMPROVEMENT DISTRICT'S FIRST AMENDED PETITION REQUESTING DECLARATORY AND INJUNCTIVE RELIEF

1. Plaintiffs, the City of Missouri City, Texas and Sienna Parks & Levee Improvement District, file this First Amended Petition Requesting Declaratory and Injunctive Relief against the Pleasanton Housing Finance Corporation ("Pleasanton HFC") and the members of its Board of Directors, each in their official capacity as board members of the Pleasanton HFC.

### I.     INTRODUCTION

2. This case arises from the actions of the Pleasanton HFC in unlawfully seeking to remove property from the public tax rolls in Fort Bend County. Pleasanton HFC was created by the City of Pleasanton, a city of

ROUTED TO COURT 5/27/2025 NS
RT'D TO D. CLERK

approximately 11,000, located in Atascosa County, about 35 miles south of San Antonio, and more than 220 miles from Fort Bend County and the property at issue in this case.

3.      Under Chapter 394 of the Texas Local Government Code, the City of Pleasanton is authorized to create a *local* housing finance corporation to promote the availability of affordable housing *within its corporate limits*. Instead, the City of Pleasanton created the Pleasanton HFC for the sole purpose of generating windfall revenue for the City at the expense of other cities, counties, school districts, and special districts located outside the City of Pleasanton and sometimes hundreds of miles from the City.

4.      In furtherance of its quest for windfall revenue, the Pleasanton HFC has now purported to acquire, or is in the process of acquiring, title to the Royal Sienna, a large existing apartment complex in Fort Bend County, under the apparent theory that it can acquire property anywhere in the State of Texas and thereby render that property exempt from taxation. The Pleasanton HFC's actions, if allowed to stand, will deprive Fort Bend County taxing jurisdictions of more than $1.2 million a year in tax revenues for as long as the property is owned by Pleasanton HFC. For its actions, the Pleasanton HFC has received, or will receive, a one-time payment of $300,000 and will ultimately transfer a substantial amount of that payment to the City of Pleasanton to use as it pleases.

**5.**     As Plaintiffs will establish, the Pleasanton HFC's actions are unlawful and contrary to the express terms of the relevant statute, which limits a housing finance corporation's authority to acquire property to only those "residential development[s]" that are located within the boundaries of the local government that created the corporation.

## II.     DISCOVERY CONTROL PLAN

**6.**     Pursuant to Rule 190 of the Texas Rules of Civil Procedure, Plaintiffs state their intention to conduct discovery under level 3.

## III.     PARTIES AND SERVICE

**7.**     Plaintiff City of Missouri City, Texas, ("Missouri City") is a home-rule municipal corporation situated in Fort Bend County and Harris County, Texas, and incorporated and operating under its City Charter and the laws of the State of Texas.

**8.**     Plaintiff Sienna Parks & Levee Improvement District ("SPLID") is a political subdivision of the State of Texas created by the Commissioners Court of Fort Bend County, Texas under authority of article XVI, section 59 of the Texas Constitution and chapter 57 of the Texas Water Code.  SPLID's boundaries encompass approximately 9,832 acres.

**9.**     Defendant, Pleasanton Housing Finance Corporation, is a Texas housing finance corporation created by the City of Pleasanton, Texas, and can be served through the Corporation's registered agent, Johnny Huizar, at 102

3

Second Street, Pleasanton, Texas 78064, or at any other location where he may be found.

10. Defendant, J.R. Gallegos, is president of the Board of Directors of the Corporation and Mayor of the City of Pleasanton. He is sued in his official capacity as a member of the Board of Directors of the Corporation. He can be served through the Corporation's registered agent, at 102 Second Street, Pleasanton, Texas 78064, or at any other location where he may be found.

11. Defendant, Joey Macon is vice-president of the Board of Directors of the Corporation and a member of the Pleasanton City Council. He is sued in his official capacity as a member of the Board of Directors of the Corporation. He can be served through the Corporation's registered agent, at 102 Second Street, Pleasanton, Texas 78064, or at any other location where he may be found.

12. Defendant, Harmony Ratterree is the secretary of the Board of Directors of the Corporation and a member of the Pleasanton City Council. She is sued in her official capacity as a member of the Board of Directors of the Corporation. She can be served through the Corporation's registered agent, at 102 Second Street, Pleasanton, Texas 78064, or at any other location where she may be found.

13. Defendant, Zachery Pawelek is the treasurer of the Board of Directors of the Corporation and a member of the Pleasanton City Council. He

4

is sued in his official capacity as a member of the Board of Directors of the Corporation. He can be served through the Corporation's registered agent, at 102 Second Street, Pleasanton, Texas 78064, or at any other location where he may be found.

14. Defendant, Robert Leonhardt is a member of the Board of Directors of the Corporation and a member of the Pleasanton City Council. He is sued in his official capacity as a member of the Board of Directors of the Corporation. He can be served through the Corporation's registered agent, at 102 Second Street, Pleasanton, Texas 78064, or at any other location where he may be found.

15. Defendant, Lillian Cashmer is a member of the Board of Directors of the Corporation and a member of the Pleasanton City Council. She is sued in her official capacity as a member of the Board of Directors of the Corporation. She can be served through the Corporation's registered agent, at 102 Second Street, Pleasanton, Texas 78064, or at any other location where she may be found.

16. Defendant, Brandon Hicks is a member of the Board of Directors of the Corporation and a member of the Pleasanton City Council. He is sued in his official capacity as a member of the Board of Directors of the Corporation. He can be served through the Corporation's registered agent, at 102 Second

5

Street, Pleasanton, Texas 78064, or at any other location where he may be found.

## IV. JURISDICTION AND VENUE

**17.** Plaintiffs bring this lawsuit to stop Defendants from acting *ultra vires* and unlawfully exercising jurisdiction over property that is outside of, and 220 miles away from, the City of Pleasanton, and within Fort Bend County, the extra-territorial jurisdiction ("ETJ") of the City of Missouri City, Texas, and the boundaries of SPLID.

**18.** Venue is proper in Fort Bend County because Missouri City, SPLID, and the subject property are in Fort Bend County and because Fort Bend County is the county in which all or a substantial part of the events or omissions giving rise to the claims occurred.

## V. TEXAS RULE OF CIVIL PROCEDURE 47(c)

**19.** For purposes of Rule 47(c) of the Texas Rules of Civil Procedure, Missouri City and SPLID states that they seek only non-monetary relief and attorneys' fees and costs.

## VI. WAIVER OF BOND

**20.** Under section 6.002 of the Texas Civil Practice & Remedies Code and in article XI, section 11.02 of Missouri City's Charter, neither the City nor SPLID is required to post an injunction bond.

## VII.  LEGAL AND FACTUAL BACKGROUND

**A.     The property in question is within the jurisdiction of Missouri City.**

21.     Missouri City is a home-rule municipality located principally in Fort Bend County and with a population of 76,773 as of the latest census data. Under Texas law, Missouri City has been granted extra-territorial jurisdiction of areas that are within 3 ½ miles of its boundaries and not within the ETJ of another city.  The Royal Sienna Apartment Complex ("Royal Sienna") is located at 5222 Avalon Point, within Missouri City's ETJ.  Royal Sienna is also located within SPLID's boundaries.

22.     Under section 43.014 of the Texas Local Government Code, Missouri City has regulatory authority over developments within its ETJ as well as the exclusive authority to annex property that is located therein.  In 1996 and 1998, the original owners of the real property, on which Royal Sienna is now located, entered into contracts with Missouri City that gave the City the right to annex the property in the future.

23.     Missouri City has grown over the years by annexing such property into the City, extending services to the annexed areas, and assessing and collecting property taxes to fund those services.  For those reasons, Missouri City has a strong interest in protecting its ability to assess and collect property

taxes on property in its ETJ so that it can fund the extension of services to that property when the City exercises its contractual right to annex the property.

24. SPLID has constructed and continues to maintain and operate the flood control infrastructure and other public facilities that benefit Royal Sienna. For those reasons, SPLID has a strong interest in protecting its ability to collect property taxes on property within its boundaries to fund its maintenance and operation costs.

## B. Chapter 394 authorizes Texas cities and counties to create housing finance corporations to promote affordable housing within their boundaries.

25. Chapter 394 of the Texas Local Government Code authorizes municipalities and counties to create housing finance corporations ("HFCs"). The purpose of the chapter is "to provide a means to finance the cost of residential ownership and development that will provide decent, safe, and sanitary housing at affordable prices for residents of local governments." Tex. Loc. Gov't Code § 394.002(a).

26. The statute gives HFCs the authority to provide home mortgages for low or moderate income purchasers and to acquire and operate apartment complexes and similar facilities for occupancy of persons of low or moderate income. *Id.* at § 394.039. Once an HFC acquires an apartment property, the property is exempt from taxation for as long as it is owned by the HFC. *Id.* at § 394.095.

8

**27.** The subject property, Royal Sienna, is a "residential development" within the definition contained in Chapter 394.

> A "residential development" is defined to include "… the acquisition of … any of the following items for the purpose of providing … housing that are an integral part of … any affordable housing project …: (A) land, an interest in land, a building or other structure, facility, system, fixture, improvement, addition, appurtenance, or machinery or other equipment … ."

*Id.* at § 394.003(13). Under section 394.903(a), a "residential development covered by this chapter **must be located in the local government**." *Id.* at § 394.903(a) (emphasis added).

**28.** Royal Sienna is located in Fort Bend County, in Missouri City's ETJ, and within the boundaries of SPLID. It is not located in the City of Pleasanton. Thus, the Pleasanton HFC is not authorized to acquire Royal Sienna, or any other property outside of Pleasanton, nor is the property eligible for the tax exemption that would otherwise apply to residential developments in Pleasanton.

**C.    The City of Pleasanton created the Pleasanton HFC as a means of generating windfall revenue for the City at the expense of other communities across the state.**

**29.** On March 14, 2023, the City of Pleasanton created the Pleasanton HFC. The City of Pleasanton's purpose in creating the HFC was not to promote affordable housing within Pleasanton but to generate revenue by selling its

9

sponsorship of affordable housing projects to real estate developers in other jurisdictions near and far for a fee of up to $300,000 each.

30. As recently as February 13, 2025, the Pleasanton HFC purported to authorize the acquisition of nine new residential developments; all of which are located outside of Pleasanton. The Pleasanton City Manager, Johnny Huizar, has admitted that the Pleasanton HFC transfers its revenue to the City which uses it for general municipal purposes, not for the provision of affordable housing.

**D.    The Pleasanton HFC purports to make major policy decisions for other local governments without any input from them.**

31. The members of the City of Pleasanton City Council also serve as the Pleasanton HFC board of directors. Were the Pleasanton HFC to consider the purchase of an existing residential development within the City of Pleasanton, as contemplated by Chapter 394, the board/city council would be expected to take into consideration the impact to the City of Pleasanton, Atascosa County, the local school district, and other local taxing jurisdictions. However, the board/city council has no incentive to consider the impact on local taxing jurisdictions when considering projects in other locations in the state. Under Defendants' apparent reading of Chapter 394, Pleasanton HFC has the right to make major decisions impacting other local governments, without any input from those governments or their citizens.

10

**E.      The Pleasanton HFC is prohibited by law from purchasing the Royal Sienna in Fort Bend County.**

32.      On March 20, 2025, Pleasanton HFC entered into a Purchase Option and Right of First Refusal Agreement (the "Option Agreement") with Royal Sienna SPE, LLC, and PHFC Royal Sienna MM, LLC, (a subsidiary of Pleasanton HFC) that contemplates the Pleasanton HFC's purchase of Royal Sienna. *See* **Exhibit 1**. The proposed purchase of the property as described in the Option Agreement would violate section 394.903(a) for the reasons stated above.

33.      It would also cause irreparable harm to Missouri City by exempting the subject property from taxation for an indefinite period. If the property is rendered tax exempt, it will negatively affect the City's right to annex the property. More specifically, if it is rendered tax exempt, Missouri City will be required to provide full public services to a large apartment complex and its hundreds of tenants without the tax revenue necessary to offset any portion of the cost of providing services.

34.      It will also cause irreparable harm to SPLID due to the resulting loss of tax revenue. As a levee improvement district, SPLID relies heavily on property taxes to fund its operations, including the construction, maintenance, and operation of flood control infrastructure. SPLID constructed public facilities that benefit Royal Sienna. SPLID will demonstrate that Defendants'

11

acquisition of the subject property and its subsequent removal from the tax rolls will materially diminish SPLID's revenue base and unfairly shift the tax burden onto remaining taxpayers within the district.

35. In tax year 2024, Royal Sienna paid $190,575 in property taxes to SPLID based on a certified value of $46,200,000 and a tax rate of $0.4125. *See* **Exhibit 2**. As of April 23, 2025, Royal Sienna is ranked #4 in the Sienna Management District's Top 25 Taxpayers Report. *Id*. While certified property values for tax year 2025 will be issued in August 2025, Royal Sienna's preliminary value is $62,000,000. Based on a similar tax rate, this would result in $255,750 in property taxes for 2025. Consequently, if this acquisition proceeds, SPLID stands to lose $255,750 in tax revenue from Royal Sienna, while the complex continues to benefit from SPLID's public facilities. To offset this lost tax revenue and cover operating expenses, SPLID will need to collect the shortfall from other taxpayers.

## VIII. CAUSES OF ACTION

A. **Declaratory Relief against Defendants.**

36. The Texas Uniform Declaratory Judgments Act ("UDJA") provides that a party "whose rights, status, or other legal relations are affected by a statute … may have determined any question of construction or validity arising under the … statute … and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code § 37.004(a). Here,

Defendants are acting under the incorrect legal theory that Chapter 394 authorizes Pleasanton HFC to acquire and own residential developments outside the boundaries of the City of Pleasanton.

37.    In fact, section 394.903(a) limits an HFC's authority—to acquire and own property and thereby render it tax exempt—to properties that are located in the local government that created the HFC.  Defendants' actions, if left standing, will have serious legal consequences to Missouri City, Fort Bend County, SPLID, and other local taxing jurisdictions by eliminating any tax revenues from Royal Sienna while leaving in place their obligation to provide full public services to the apartment complex and its hundreds of tenants.

38.    Plaintiffs request that the Court issue a judgment declaring that:

a)    Pleasanton HFC is prohibited by state law from acquiring or owning the property located at 5222 Avalon Point in Fort Bend County and known as the Royal Sienna apartments;

b)    The property located at 5222 Avalon Point in Fort Bend County and known as the Royal Sienna apartments is not eligible for a tax exemption under Chapter 394 of the Texas Local Government Code;

c)    Pleasanton HFC is prohibited by state law from acquiring or owning any property that is located in the City of Missouri City, its ETJ, or SPLID;

d)    Pleasanton HFC is prohibited by state law from seeking or obtaining tax exemptions on any property located in the City of Missouri City, its ETJ, or SPLID.

13

## B.    Injunctive Relief.

39.    As explained above, Defendants have acquired, or are in the process of acquiring, the Royal Sienna apartment complex in Fort Bend County with the intention of making the property exempt from taxation by Missouri City, SPLID, and other taxing jurisdictions in Fort Bend County.  Such action is in violation of  section 394.903(a) of the Texas Local Government Code.

40.    Unless Defendants are enjoined from going forward with the acquisition of the Royal Sienna and seeking to render the property tax exempt, Missouri City and SPLID will suffer irreparable harm.  Plaintiffs' right to annex the property will be burdened by the obligation to provide full public services to a large apartment complex but unable to offset any of the costs of those services through the collection of property taxes.  More specifically, and based on current tax rates, Plaintiffs will collectively lose approximately $600,000 a year in tax revenue.  For these reasons, Missouri City requests that the Court enter a temporary restraining order, temporary injunction, and, upon final trial, a permanent injunction enjoining Defendants from:

a)    taking any further action toward the acquisition of the property located at 5222 Avalon Point in Fort Bend County and known as the Royal Sienna apartments or any other property located in Missouri City, its ETJ, or SPLID; and

b)    taking any action to seek a tax exemption for the property located at 5222 Avalon Point in Fort Bend County and known as the Royal Sienna apartments or any other property located in Missouri City, its ETJ, or SPLID.

14

## C.     Attorneys' Fees and Other Relief.

41.     Plaintiffs request that the Court award Plaintiffs a judgment against the public official defendants, in their official capacities, and to award the City its reasonable and necessary attorneys' fees under the authority of the Uniform Declaratory Judgment Act.  Plaintiffs also request an order awarding it costs of court and such other relief to which it may show itself entitled.

Respectfully submitted,

**OLSON & OLSON, L.L.P.**

By:     */s/ Jordan Marget*
Allison S. Killian
State Bar No. 24099785
akillian@olsonllp.com
Jordan Marget
State Bar No. 24130447
jmarget@olsonllp.com
2727 Allen Parkway, Suite 600
Houston, Texas 77019
Telephone:  (713) 533-3800
Facsimile:   (713) 533-3888

**COUNSEL FOR PLAINTIFFS,
CITY OF MISSOURI CITY, TEXAS &
SIENNA PARKS & LEVEE
IMPROVEMENT DISTRICT**

15

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2025, a true and correct copy of the foregoing was sent as indicated to all counsel of record in accordance with Tex. R. Civ. P. 21 and 21a, as follows:

Blake W. Stribling                                            ***Via electronic service***
Daniel J. Lecavalier
CHASNOFF | STRIBLING, LLP
1020 N.E. Loop 410, Suite 150
San Antonio, Texas 78209
bstribling@chasnoffstribling.com
dlecavalier@chasnoffstribling.com


                                                */s/ Jordan Marget*
                                                Jordan Marget

# AFFIDAVIT OF VERIFICATION

**STATE OF TEXAS** §
§
**COUNTY OF FORT BEND** §

BEFORE ME, the undersigned notary, on this day personally appeared Angel L. Jones, the affiant, whose identity is known to me. After I administered an oath, Angel L. Jones testified as follows:

> My name is Angel L. Jones. I certify that I am qualified and authorized to make this verification. I am the City Manager of the City of Missouri City, Texas. I have read the foregoing City of Missouri City and Sienna Parks & Levee Improvement District's First Amended Petition Requesting Declaratory and Injunctive Relief. The facts stated therein are within my personal knowledge and are true and correct to the best of my knowledge.

_____
Angel L. Jones

Sworn to and subscribed to me by on ___May 27___, 2025.

_____
Notary Public in and for
The State of Texas

My Commission Expires: 2/13/2029

KIM THOMAS
Notary ID #131061991
My Commission Expires
February 13, 2029

17

# AFFIDAVIT OF VERIFICATION

**STATE OF TEXAS**      §

                                     §

**COUNTY OF FORT BEND**   §

BEFORE ME, the undersigned notary, on this day personally appeared Temika B. Jones, the affiant, whose identity is known to me. After I administered an oath, Temika B. Jones testified as follows:

> My name is Temika B. Jones. I certify that I am qualified and authorized to make this verification. I am the President of Sienna Parks & Levee Improvement District. I have read the foregoing City of Missouri City and Sienna Parks & Levee Improvement District's First Amended Petition Requesting Declaratory and Injunctive Relief. The facts stated therein are within my personal knowledge and are true and correct to the best of my knowledge.

_____
Temika B. Jones

Sworn to and subscribed to me by on ___May 23___, 2025.

_Samantha E Edwards_
Notary Public in and for
The State of Texas

My Commission Expires: __May 9, 2027__

SAMANTHA E. EDWARDS
My Notary ID # 134349285
Expires May 9, 2027

18

# EXHIBIT 1

2025026666
ELECTRONICALLY RECORDED
Official Public Records
3/24/2025 12:50 PM



Laura Richard, County Clerk
Fort Bend County Texas
Pages:    12    Fee: $ 59.00

srecording, please
return original document to:

Cantu Harden Montoya LLP
1020 NE Loop 410, Suite 401
San Antonio, Texas 78209
Attn: Carey R. Troell, Esq.

## PURCHASE OPTION AND
## RIGHT OF FIRST REFUSAL AGREEMENT

STATE OF TEXAS    §

                           §

COUNTY OF FORT BEND  §

This **PURCHASE OPTION AND RIGHT OF FIRST REFUSAL AGREEMENT** (this *"Agreement"*) is made as of March 20 2025 (the *"Effective Date"*), by and among **Royal Sienna SPE, LLC**, a Delaware limited liability company (the *"Owner"* or *"Grantor"*), **Pleasanton Housing Finance Corporation**, a Texas public nonprofit housing finance corporation (the "Grantee"), and **PHFC Royal Sienna MM, LLC,** a Texas limited liability company (the *"Managing Member"*).

### RECITALS

A.    The Owner is governed by an Operating Agreement dated as of the date hereof, among the Managing Manager and Royal Sienna SPE, LLC (the *"Sponsor Member"*) (as it may be amended from time to time, the *"Operating Agreement"*). The Managing Member is an affiliate of the Grantee.

B.    The Owner was formed for the purposes of acquiring a leasehold interest (the *"Leasehold Interest"*) in certain real property more fully described in the legal description attached hereto as **Exhibit A** (the *"Land"*), and financing, owning, maintaining, renovating, operating, leasing, and selling or otherwise disposing of a multifamily housing development (including buildings, improvements, furnishings, equipment and personal property) located on the Land and commonly known as "Royal Sienna Apartments" located at 5222 Avalon Point, Missouri City, Texas 77459 (the *"Project"*). Concurrently herewith, the Owner has entered into a ground Lease ("**Ground Lease**") with Grantee as the lessor (the "**Lessor**"), and the Owner, as the lessee.

C.    In consideration of the participation of its affiliates as the Managing Member and Lessor, and for the opportunity to expand the availability of decent, safe, sanitary, affordable housing in Missouri City, Texas, the Grantee desires to have the right to acquire the Owner's interest in the Project and any buildings, improvements, furnishings, equipment, and personal property comprising the Project or associated with the physical operation thereof, located at the Project and owned by the Owner at the time of purchase, the Leasehold Interest in the Land, and certain related assets (together, the *"Project"*).

PURCHASE OPTION AND RIGHT OF FIRST REFUSAL AGREEMENT

D.      The Owner desires to give, grant, bargain, sell, and convey to Grantee rights to purchase the Project on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Grant and Exercise of Option**.

a.      During the term of the Ground Lease, except as otherwise set forth in the Ground Lease, the Owner hereby grants to the Grantee an option (the "*Option*") to purchase the Project on any date forty-five (45) days after the Grantee delivers notice to the Owner and each of its members of the Grantee's intent to exercise the Option, on the terms and conditions set forth in this Agreement.

2.      **Options Purchase Price**.

a.      The purchase price for the Project under the Option shall be an amount equal to the sum of (I) Fair Market Value of the land and improvements comprising the Project and (II) the sum of (i) an amount, on an after-tax basis, equal to the diminution of economic value to the Owner's members as a result of the purchase of the Owner's interest in, the Project by Grantee (the "**Owner Diminution**"), which amount shall include, without limitation, (A) 125% of the aggregate of all capital contributions and any other advances of any made by the partners of the Tenant prior to closing of the Option; (B) the outstanding balance of all loans (and any accrued interest and yield maintenance thereon) made to the Owner by its members (or their respective affiliates) or the guarantors and any other lenders, which will not otherwise be repaid at the time of the purchase; (C) any accrued and unpaid fees owed to the Owner or its affiliates in connection with the Project and (ii) all unreimbursed costs and expenses incurred by or on behalf of Owner's investors with respect to (A) admission to the syndication, (B) activities with respect to the Project, prior to the Managing Member's purchase of the ownership interest in the Project under this Option; (C) an amount to distribute to Owner's limited investors cash proceeds sufficient to enable its limited investors to pay, after any and all taxes imposed on such distribution, the taxes projected to be imposed on the limited investors as a result of the sale pursuant to the Option. For the purpose of the Option, fair market value shall be determined in accordance with the syndication.

b.      The fair market value ("*Fair Market Value*") of the land and improvements comprising the Project shall take into consideration any recorded land-use restrictions and any third-party liens on the Project (and assuming that any property tax exemption remains with the Project), and any such appraisal to be made by an independent appraiser agreed to by the Grantee and Sponsor Member.  If the Grantee and Sponsor Member are unable to agree upon an appraiser, the appraisal methodology used by the appraiser, and/or the appraisal value determined by the appraiser, the Grantee and Sponsor Member shall each choose its own appraiser and the two appraisers shall together appoint a third appraiser.  The three appraisers shall each determine the Fair Market Value of the Project within thirty (30) days after the appointment of the third appraiser, and the Fair Market Value of the Project shall be the average of the three appraisers' determinations; provided, that if one or more of the appraisers' determinations is more than ten percent (10%) higher or lower than the average of the three determinations, the determination(s) of such appraiser(s) shall be disregarded in determining the Fair Market Value of the Project, and

provided, further, that if none of the appraisers' determinations differs from the average of the three determinations by ten percent (10%) or less, the Fair Market Value shall be the middle of the three determinations.  The Grantee and the Sponsor Member shall each be responsible to pay the fees and expenses of its own appraiser, and the fees and expenses of any jointly selected appraiser (including one jointly selected by each party's appraiser) shall be borne equally between the Grantee and the Sponsor Member.

      c.    Grantee may, at its option, exercise the Option described in this section by acquiring all of the equity interests of the Sponsor Members. Such purchase price will be paid by Grantee to Grantor in exchange for an assignment of the interest as mor particularly set forth below.

3.     **Grant and Exercise of Right of First Refusal**.  Provided that the Managing Member has not been removed or withdrawn from the Owner, and except as otherwise set forth in the Ground Lease, in the event that the Sponsor Member receives from a ready, willing, and able third party purchaser an acceptable bona fide offer to purchase (a) the unencumbered fee estate and termination of the Ground Lease, (b) all interest of the Sponsor Member in the Grantor, or (c) an assignment of Grantor's rights under the Gound Lease (any of the foregoing, an "*Offer*"), which Offer the Sponsor Member intends to accept on behalf of the Owner), the Grantee will have an irrevocable and exclusive right of first refusal to purchase the Project or Leasehold Interest for which the Offer has been made (the "*Refusal Right*") for terms not less favorable than those set forth in the Offer (including but not limited to price, conditions to closing, and timing for closing), and subject to the terms and conditions of this Agreement.  If the Sponsor Member receives an Offer, which Offer the Sponsor Member intends to accept, the Sponsor Member will give written notice of the Offer to Grantee, specifying the name and address of such third-party purchaser and the price and a copy of the Offer which sets out all of the terms of the Offer.  The Grantee will thereupon have the right to exercise the Refusal Right by giving written notice of Grantee's intent to exercise the Refusal Right on terms not less favorable than those set forth in the Offer to the Sponsor Member within thirty (30) days after the Grantee's receipt of the written notice of the Offer from the Sponsor Member.  The Sponsor Member (on behalf of the Owner or individually, as applicable) may accept an Offer subject to the Grantee's Refusal Right described herein. Grantee shall have ninety (90) days following receipt of the Offer in which to close the transaction. In addition to all other applicable conditions set forth in this Agreement, the foregoing grant of the Refusal Right shall be effective only if the Grantee is a governmental agency in good standing on the date that the Refusal Right has been exercised and the date on which the resulting purchase and sale has been closed.  In the event that the Refusal Right is not exercised within the time outlined above or Grantee does not close in the applicable time period, no subsequent change in the terms of an Offer (other than a reduction of the purchase price set forth in the original Offer by more than 10%) will be deemed to reinstate the Refusal Right or otherwise renew the Grantee's opportunity to exercise the Refusal Right and Sponsor Member shall have a period of twelve (12) months commencing on the thirty-first (31st) day following Grantee's receipt of the Offer in which to consummate the sale as presented in the Offer. If Sponsor Member does not consummate the sale within said twelve (12) month period then the Refusal Right shall be reinstated. If the Sponsor Member does consummate the sale within said twelve (12) month period, then the Option and Refusal Right shall be terminated and have no further force or effect. Owner shall not be obligated to reimburse Managing Member for its reasonable costs (including attorney fees) in connection with a sale to the Grantee entity pursuant to the Refusal Right.

4. **Conditions Precedent; Termination.**

a.      Notwithstanding anything in this Agreement to the contrary, the Refusal Right, and Options granted hereunder shall be contingent on the following being true and correct at the time of exercise and any purchase pursuant thereto: (i) neither Grantee nor any affiliate of Grantee is in material default past all applicable notice and cure periods under the Operating Agreement or any agreement with Owner or Investment Member, (ii) Grantee, or an affiliate thereof, shall continue to be the majority owner of the managing member of Owner, except as otherwise provided in Section 5.b.(iv) below, and (iii) Grantee shall be a housing finance corporation. If such conditions precedent are not satisfied, the Refusal Right and/or Options shall not be exercisable and this Agreement shall be of no further force or effect.

b.      This Agreement shall automatically terminate upon:

(i)      the transfer of the Project to any lender of Owner having a security interest in the Project (by foreclosure, deed in lieu of foreclosure or otherwise) in total or partial satisfaction of any Project indebtedness; or

(ii)      the Project ceases to meet the restrictions as set forth in the Regulatory Agreement and Declaration of Restrictive Covenants by and between Grantee and Grantor; or

(iii)      any transfer or attempted transfer of all or part of the Refusal Right, whether by operation of law or otherwise, except as otherwise permitted herein; or

(iv)      the removal of Managing Member as the managing member of Owner pursuant to the provisions of the Operating Agreement, provided, however, that this Agreement shall be automatically reinstated if, within thirty (30) days' after such removal, (1) Grantee satisfies any payment obligations to Sponsor Member and any other member of Owner under the Operating Agreement in full, and (2) Grantee pays all costs and expenses (including reasonable attorney's fees) incurred in connection with the removal and replacement of Managing Member and the correction of any issues or conditions at the Project that arise, either directly or indirectly, from the action or omission of Managing Member leading up to its removal; or

(v)      Grantee's acquisition of legal title to the Project.

5.      **Contract and Closing.**

a.      Timeframe for Closing.

i.      Option. If the Grantee elects to exercise the Option in accordance with the terms of Section 2.a. of this Agreement, the Grantee and the Owner shall enter into a written contract for the purchase and sale in accordance with the terms of this Agreement and containing such other terms and conditions as are standard and customary for similar commercial transactions in the geographic area in which the Project is located, providing for a closing within sixty (60)

PURCHASE OPTION AND RIGHT OF FIRST REFUSAL AGREEMENT                                      4

days after the date of the Grantee's notice of its intent to exercise the Option (such date to be extended if necessary, so long as the Grantee is diligently undertaking efforts to close on the acquisition of the Project, but in no event will such extension be for longer than thirty (30 days). In the absence of any such purchase and sale contract, this Agreement shall be specifically enforceable upon the exercise of the Option.

ii.     Refusal Right. If the Grantee elects to exercise its Refusal Right in accordance with the terms of Section 2 of this Agreement, the Owner and the Grantee shall enter into a written contract for the purchase and sale of the Project, Membership Interests, or the Leasehold Interest, as the case may be, in accordance with the terms of the Offer and this Agreement.

b.     Conveyance Documents.

i.     Options or Refusal Right. In connection with a closing on the Project pursuant the Options or the Refusal Right, the Owner's right, title and interest in the Project and the Land shall be conveyed by a warranty deed (the "**Deed**"), a blanket conveyance, bill of sale and assignment agreement (the "**Bill of Sale**"), and an assignment of the Owner's interests under the Ground Lease (the "**Ground Lease Assignment**" and together with the Deed and the Bill of Sale, the "**Conveyance Documents**"). Upon closing, the Owner, at the Grantee's cost, shall deliver to the Grantee, along with the Conveyance Documents, a Texas form Owner's Title Policy (the "**Title Policy**") dated as of the close of escrow, in the amount of the purchase price, subject to the liens, encumbrances and other exceptions then affecting the title.

iii.     As-Is. Any closing pursuant to the Options or Refusal Right shall be on an as-is, where-is basis, without representation or warranty.

c.     Payment of Closing Costs. The Grantee shall be responsible for all closing costs incurred pursuant to its exercise of any of the Options or the Refusal Right, including, but not limited to, transfer taxes , exit taxes, and income taxes (including, without limitation all federal, state and local income taxes incurred by Sponsor Member or any of their affiliates) , any loan prepayment costs fees, penalties and costs (e.g. interest rate breakage costs), a four percent (4%) broker commission payable to Sponsor Member and recording costs. In addition, with respect to the Options or the Refusal Right, rents, insurance, taxes, debt service then due and payable and other costs and revenues then prepaid or accrued, as the case may be, shall be apportioned as of midnight of the day preceding the closing of title, except that rents shall be apportioned as of the date of actual collection thereof (which obligation shall survive the closing). Notwithstanding the foregoing, each party shall pay its own legal fees.

d.     Guaranties. In addition, as a condition to closing pursuant to the any of the Options or the Refusal Right, if any guaranty agreements (the "**Outstanding Guaranty Agreements**") provided by the Sponsor Member or its affiliates (collectively, the "**Guarantors**") with respect to the Project would remain in effect upon the Grantee's acquisition of the Project or the Membership Interests, the Grantee shall provide for the replacement or release of the Guarantors under the Outstanding Guaranty Agreements.

6.     **Existing Indebtedness**.  To the extent that consent can be obtained from the then holder(s) of any of the mortgage indebtedness with respect to the Project, the Grantee may pay all or a portion of the purchase price for the Options or the Refusal Right by assuming the existing indebtedness of the Project, provided the Owner, Sponsor Member and the Guarantors are all released from any liability with respect thereto.  The Owner agrees, upon the request of the Grantee, to use reasonable efforts (other than the payment of money) to obtain such consent of the holder(s) of any indebtedness, which efforts shall not extend the timeframe for closing of the purchase and sale of the Project unless otherwise agreed to by the Owner and the Grantee.

7.     **Assignments**.  The Grantee is prohibited from assigning all or any of its rights under this Agreement.  Notwithstanding the foregoing, the Grantee's use of a wholly owned subsidiary to facilitate the Grantee's acquisition of the Project in accordance with the terms of this Agreement shall not be construed as an assignment of the Grantee's rights under this Agreement.

8.     **Subordination; Termination**.  The Project has been financed by a loan from LoanCore 2022-CRE7 Issuer Ltd., a Cayman Islands exempted company (the "*Lender*").  This Agreement shall at all times be subordinate to the Loan and the rights of Lender under the Loan documents.  The parties hereto agree that if Grantee elects to assume the payment of the existing indebtedness pursuant to Section 5 then this Agreement shall be unconditionally subordinated to the (a) the lien, security interest and rights of the Lender pursuant to the documents related to the Loan (the "*Loan Documents*"), (b) all advances or charges made or accruing under or secured by the Loan Documents, and (c) any extensions, modifications or renewals of the indebtedness secured by the Loan Documents.  Any modification to this Section 7 requires the prior written consent of the Lender.  In addition, this Agreement shall terminate upon any transfer by foreclosure or deed in lieu of foreclosure of the Loan.

9.     **Transfer**.  The Refusal Right and Options shall not be transferred to any Person without the consent of Sponsor Member.  In the case of any such permitted transfer, (i) all conditions and restrictions applicable to the exercise of the Refusal Right and Options or the purchase of the Project pursuant thereto shall also apply to such transferee, and (ii) such transferee shall be disqualified from the exercise of any rights hereunder at all times during which Grantee would have been ineligible to exercise such rights hereunder had it not effected such transfer.

10.     **Legal Proceedings**.  Except as otherwise provided herein, in the event that legal proceedings are commenced by any party to this Agreement against any other party to this Agreement, the prevailing party shall be entitled to recover all reasonable attorney's fees and expenses.

11.     **Notices**.  All notices, demands, or other communications hereunder shall be in writing and deemed to have been given when the same are (a) deposited in the United States mail and sent by certified or registered mail, postage prepaid, (b) deposited with Federal Express or another nationally recognized overnight delivery service, or (c) delivered personally, in each case to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to all other parties to this Agreement:

To the Owner:                Royal Sienna SPE, LLC
2220 Coit Rd., Suite 480-214
Plano, Texas 75075
Attention:  Iqbal Mutabanna

With a copy to:           MW Law, PLLC
5001 LBJ Fwy, Suite 830
Dallas, Texas 75244
Attn: Pete Larsen, Partner

To the Grantee:          Pleasanton Housing Finance Corporation
108 Second Street
Pleasanton, Texas 78064
Attn: President

With a copy to:           Cantu Harden Montoya LLP
1020 NE Loop 410, Suite 401
San Antonio, Texas 78209
Attn:  Carey R. Troell, Esq.

To the Managing Member:   PHFC Royal Sienna MM, LLC
108 Second Street
Pleasanton, Texas 78064
Attn: President

With a copy to:           Cantu Harden Montoya LLP
1020 NE Loop 410, Suite 401
San Antonio, Texas 78209
Attn:  Carey R. Troell, Esq.

To the Sponsor
Member:                    Royal Sienna Fund, LLC
2220 Coit Rd., Suite 480-214
Plano, Texas 75075
Attention:  Iqbal Mutabanna

With a copy to:           MW Law, PLLC
5001 LBJ Fwy, Suite 830
Dallas, Texas 75244
Attn: Adnan Merchant, Partner

12.    **Binding Provisions**. This Agreement is binding upon and inures to the benefit of the parties hereto, and their heirs, executors, personal representatives, successors, and assigns. No party to this Agreement may assign the rights under this Agreement without the consent of each other party hereto other than as otherwise permitted hereunder, which consent will not be

PURCHASE OPTION AND RIGHT OF FIRST REFUSAL AGREEMENT

unreasonably withheld or delayed. Any amendment(s) to this Agreement will be effective only if set forth in writing and signed by each party hereto.

13.    **Miscellaneous Provisions.**

a.    Time is of the essence with respect to this Agreement, and all provisions relating thereto shall be so construed.

b.    Each provision of this Agreement will be considered severable, and if for any reason any provision that is not essential to the effectuation of the basic purposes of the Agreement is determined to be invalid and contrary to any existing or future law, such invalidity will not impair the operation of or affect those provisions of this Agreement that are valid.

c.    No party hereto will be deemed to have waived any rights hereunder unless such waiver is in writing and signed by such party.  The waiver by any party of any breach of this Agreement will not operate or be construed to be a waiver of any subsequent breach.

d.    This Agreement will be construed and enforced in accordance with the laws of the State of Texas, exclusive of its conflict of laws principles.

e.    All headings and captions in this Agreement, if any, are for convenience of reference only and are not intended to qualify the meaning of any provision.

f.    This Agreement and any amendments hereto may be executed in several counterparts, each of which are deemed to be an original copy, and all of which together constitute one agreement binding on all parties, hereto, notwithstanding that all the parties may not have signed the same counterpart.

[SIGNATURE PAGE FOLLOWS]

PURCHASE OPTION AND RIGHT OF FIRST REFUSAL AGREEMENT

8

IN WITNESS WHEREOF, the parties have executed this document as of the date first set forth hereinabove.

MANAGING MEMBER:

PHFC ROYAL SIENNA MM, LLC

By: _____
Johnny Huizar, Authorized Signer

STATE OF TEXAS

COUNTY OF ATASCOSA

This instrument was acknowledged before me on this 3rd day of March, 2025, by Johnny Huizar of the PHFC Royal Sienna MM, LLC, a Texas limited liability company, on behalf of said corporation.

(SEAL)

VICTORIA BLANCA GUILLEN
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 04/09/27
NOTARY ID 131965890

VBGuillen
Notary Public in and for the State of Texas

Victoria B. Guillen
(Printed Name of Notary)
My commission expires: 4/9/27

PURCHASE OPTION AND RIGHT OF FIRST REFUSAL AGREEMENT                    SIGNATURE PAGE

OWNER:

**ROYAL SIENNA SPE LLC**
a Delaware limited liability company

By: _____
Name:  Dustin Howard
Title:   Authorized Representative


STATE OF TEXAS

COUNTY OF _DALLAS_

    This instrument was acknowledged before me on this 4th day of March, 2025, by Dustin Howard, Authorized Representative of Royal Sienna SPE, LLC, a Delaware limited liability company, on behalf of said entity.

(SEAL)

_____
Notary Public, State of _TEXAS_

_Debbie Henry_
(Printed Name of Notary)
My commission expires:  3/26/26

NOTARY PUBLIC
STATE OF TEXAS
DEBBIE HENRY
Notary ID #979855
My Commission Expires
March 26, 2026

GRANTEE:

PLEASANTON HOUSING FINANCE CORPORATION

By: _____
Johnny Huizar, Authorized Signer

STATE OF TEXAS    §
                        §

COUNTY OF ATASCOSA   §

This instrument was acknowledged before me on this 3rd day of March, 2025, by Johnny Huizar of the PLEASANTON HOUSING FINANCE CORPORATION, a Texas public nonprofit housing finance corporation, on behalf of said corporation.

(SEAL)

VICTORIA BLANCA GUILLEN
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 04/09/27
NOTARY ID 131965890

_VPGuillen_
Notary Public in and for the State of Texas

_Victoria B. Guillen_
(Printed Name of Notary)
My commission expires: 4|9|27

PURCHASE OPTION AND RIGHT OF FIRST REFUSAL AGREEMENT        SIGNATURE PAGE

**EXHIBIT A**

**LEGAL DESCRIPTION**

Unrestricted Reserve "A", in Block 1, of BROADSTONE SIENNA FINAL PLAT, a subdivision in Fort Bend County, Texas according to the map or plat thereof recorded under Plat No. 20190193 of the Map and/or Plat Records of Fort Bend County, Texas.



# EXHIBIT 2

Jurisdiction: SM105

Tax Year: 2024
Certified Values Only

SIENNA MANAGEMENT DISTRICT
Top 25 Taxpayers Report
As of 4/23/2025

Page 1
4/23/2025
1:12 PM

| Rank | Name | This Year | | Last Year | | % |
|------|------|-----------|--|-----------|--|---|
| | | Accounts | Net Taxable | Accounts | Net Taxable | Juri |
| 1 | OHT SIENNA LLC | 2 | 59,616,220 | 1 | 16,009,900 | 12.812% |
| | Improvement Non HS,Land Non HS,Personal Property | | | | | |
| 2 | ORION RAVELLA PROPERTY DE LLC | 1 | 55,249,680 | 1 | 37,100,000 | 11.873% |
| | Improvement Non HS,Land Non HS | | | | | |
| 3 | RANCH@SIENNA EQUITY PARTNERS PROPERTY LLC | 1 | 49,285,869 | 1 | 43,536,324 | 10.592% |
| | Improvement Non HS,Land Non HS | | | | | |
| 4 | ROYAL SIENNA SPE LLC | 2 | 46,200,000 | 2 | 46,200,000 | 9.929% |
| | Improvement Non HS,Land Non HS,Personal Property | | | | | |
| 5 | ELYSIAN AT SIENNA PLANTATION LP | 1 | 36,083,813 | 1 | 30,000,000 | 7.755% |
| | Improvement Non HS,Land Non HS | | | | | |
| 6 | VILLAS OF ELYSIAN AT SIENNA PLANTATION LP | 1 | 27,283,945 | 1 | 24,255,000 | 5.863% |
| | Improvement Non HS,Land Non HS | | | | | |
| 7 | HEB GROCERY COMPANY LP | 2 | 18,138,819 | 2 | 14,886,915 | 3.898% |
| | Improvement Non HS,Land Non HS | | | | | |
| 8 | EIGHTY SEVEN TWENTY SIENNA LTD | 5 | 17,327,780 | 5 | 16,500,000 | 3.724% |
| | CBL Adjustment,Improvement Non HS,Land Non HS | | | | | |
| 9 | SIENNA CYPRESS LLC | 2 | 9,244,291 | 2 | 7,849,238 | 1.987% |
| | CBL Adjustment,Improvement Non HS,Land Non HS | | | | | |
| 10 | BHATIA FAMILY PARTNERSHIP LTD ETAL | 1 | 8,578,950 | 1 | 8,432,908 | 1.844% |
| | Improvement Non HS,Land Non HS | | | | | |
| 11 | SIENNA RETAIL DEVELOPMENT LLC | 4 | 8,451,126 | 4 | 7,452,338 | 1.816% |
| | CBL Adjustment,Improvement Non HS,Land Non HS | | | | | |
| 12 | H-E-B LP | 1 | 7,309,657 | 1 | 6,591,269 | 1.571% |
| | Personal Property | | | | | |
| 13 | PROVIDENT TRUST GROUP LLC | 1 | 5,001,277 | 1 | 4,320,459 | 1.075% |
| | Improvement Non HS,Land Non HS | | | | | |
| 14 | WE 71 SIENNA CROSSING LLC | 2 | 4,938,404 | 2 | 4,938,404 | 1.061% |
| | Land Non HS | | | | | |
| 15 | UNIUS PROPERTY LP | 1 | 4,660,000 | 1 | 4,524,830 | 1.001% |
| | Improvement Non HS,Land Non HS | | | | | |
| 16 | BEGUM JAAN LLC | 3 | 4,326,297 | 3 | 3,918,063 | 0.930% |
| | CBL Adjustment,Improvement Non HS,Land Non HS | | | | | |
| 17 | SIENNA/JOHNSON NORTH LP | 15 | 4,310,791 | 15 | 4,079,481 | 0.926% |
| | CBL Adjustment,Land Non HS | | | | | |
| 18 | SIENNA LAKES LLC | 1 | 4,209,656 | 1 | 3,751,160 | 0.905% |
| | Improvement Non HS,Land Non HS | | | | | |
| 19 | TEXAS DOW EMPLOYEES CREDIT UNION | 2 | 3,955,240 | 2 | 3,735,364 | 0.850% |
| | Improvement Non HS,Land Non HS,Personal Property | | | | | |
| 20 | CENTRE AT SIENNA CREEK LLC | 1 | 3,902,176 | 1 | 4,235,860 | 0.839% |
| | CBL Adjustment,Improvement Non HS,Land Non HS | | | | | |
| 21 | AEI ACCREDITED INVESTOR FUND VI LP | 1 | 3,893,685 | 1 | 3,388,747 | 0.837% |
| | CBL Adjustment,Improvement Non HS,Land Non HS | | | | | |
| 22 | ALDI TEXAS LLC | 2 | 3,636,751 | 2 | 3,328,199 | 0.782% |
| | Improvement Non HS,Land Non HS | | | | | |
| 23 | TEXAS PETROLEUM GROUP LLC | 2 | 3,593,087 | 2 | 3,173,282 | 0.772% |
| | CBL Adjustment,Improvement Non HS,Land Non HS,Personal Property | | | | | |
| 24 | MALABAR HILL SIENNA LP | 1 | 3,230,150 | 1 | 571,630 | 0.694% |
| | Improvement Non HS,Land Non HS | | | | | |

Jurisdiction: SM105

Tax Year: 2024
Certified Values Only

SIENNA MANAGEMENT DISTRICT
Top 25 Taxpayers Report
As of 4/23/2025

Page 2
4/23/2025
1:12 PM

| Rank | Name | This Year | | Last Year | | % |
|------|------|-----------|---|-----------|---|---|
| | | Accounts | Net Taxable | Accounts | Net Taxable | Juri |
| 25 | PARI PROPERTIES LLC | 1 | 3,221,404 | 1 | 3,150,000 | 0.692% |
| | CBL Adjustment,Improvement Non HS,Land Non HS | | | | | |
| | Totals | 56 | 395,649,068 | 55 | 305,929,371 | |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kaela Olson on behalf of Jordan Marget
Bar No. 24130447
kolson@olsonllp.com
Envelope ID: 101267238
Filing Code Description: Amended Filing
Filing Description: City of Missouri City and Sienna Parks & Levee Improvement District's First Amended Petition Requesting Declaratory and Injunctive Relief
Status as of 5/27/2025 11:49 AM CST

Associated Case Party: City of Missouri City, Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Hightower | 9614200 | jhightower@olsonllp.com | 5/27/2025 11:05:40 AM | SENT |
| Allison Killian | 24099785 | akillian@olsonllp.com | 5/27/2025 11:05:40 AM | SENT |
| E. Joyce Iyamu | | ejiyamu@missouricitytx.gov | 5/27/2025 11:05:40 AM | SENT |
| Jordan Marget | 24130447 | jmarget@olsonllp.com | 5/27/2025 11:05:40 AM | SENT |

Associated Case Party: Pleasanton Housing Finance Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Daniel Lecavalier | 24129028 | dlecavalier@chasnoffstribling.com | 5/27/2025 11:05:40 AM | SENT |
| Blake W.Stribling | | bstribling@chasnoffstribling.com | 5/27/2025 11:05:40 AM | SENT |

Associated Case Party: Sienna Parks & Levee Improvement District

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Joel Cleveland | | Joel@mullerlawgroup.com | 5/27/2025 11:05:40 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rachel Feltner on behalf of Blake Stribling
Bar No. 24070691
rfeltner@chasnoffstribling.com
Envelope ID: 102729296
Filing Code Description: Letter
Filing Description: Jurisdictional Response
Status as of 7/3/2025 7:05 AM CST

Associated Case Party: Pecos Housing Finance Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeffrey MTillotson | | jtillotson@tillotsonlaw.com | 7/2/2025 11:39:12 PM | SENT |
| Kassi Yukevich | | kyukevich@tillotsonlaw.com | 7/2/2025 11:39:12 PM | SENT |
| Amanda Reichek | | areichek@tillotsonlaw.com | 7/2/2025 11:39:12 PM | SENT |
| Daniel J.Lecavalier | | dlecavalier@chasnoffstribling.com | 7/2/2025 11:39:12 PM | SENT |
| Blake W.Stribling | | bstribling@chasnoffstribling.com | 7/2/2025 11:39:12 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| TJP Service | | tillotsonjohnsonpatton@gmail.com | 7/2/2025 11:39:12 PM | SENT |
| Sean Wallace | | swallace@tillotsonlaw.com | 7/2/2025 11:39:12 PM | SENT |
| Christopher Schluter | | cschluter@chasnoffstribling.com | 7/2/2025 11:39:12 PM | SENT |
| Julie Whitson | | jwhitson@chasnoffstribling.com | 7/2/2025 11:39:12 PM | SENT |
| Kim Decker | | kdecker@chasnoffstribling.com | 7/2/2025 11:39:12 PM | SENT |
| Rachel Feltner | | rfeltner@chasnoffstribling.com | 7/2/2025 11:39:12 PM | SENT |
| Devlin Browne | | dbrowne@tillotsonlaw.com | 7/2/2025 11:39:12 PM | SENT |

Associated Case Party: City of Arlington, Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Nena Chima-Tetteh | | nena.chima-tetteh@arlingtontx.gov | 7/2/2025 11:39:12 PM | SENT |
| Joseph N.Nguyen | | joseph.nguyen@arlingtontx.gov | 7/2/2025 11:39:12 PM | SENT |
| Jonathan Moss | | jonathan.moss@arlingtontx.gov | 7/2/2025 11:39:12 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rachel Feltner on behalf of Blake Stribling
Bar No. 24070691
rfeltner@chasnoffstribling.com
Envelope ID: 102729296
Filing Code Description: Letter
Filing Description: Jurisdictional Response
Status as of 7/3/2025 7:05 AM CST

Associated Case Party: City of Arlington, Texas

| | | | | |
|---|---|---|---|---|
| Jonathan Moss | | jonathan.moss@arlingtontx.gov | 7/2/2025 11:39:12 PM | SENT |
| Alexander J.Lindvall | | alexander.lindvall@arlingtontx.gov | 7/2/2025 11:39:12 PM | SENT |
| Galen Gatten | | galen.gatten@arlingtontx.gov | 7/2/2025 11:39:12 PM | SENT |

Associated Case Party: City of Fort Worth, Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Stephen Cumbie | | stephen.cumbie@fortworthtexas.gov | 7/2/2025 11:39:12 PM | SENT |
| Christopher Mosley | | chris.mosley@fortworthtexas.gov | 7/2/2025 11:39:12 PM | SENT |
| Olyn Poole | | olyn.poole@fortworthtexas.gov | 7/2/2025 11:39:12 PM | SENT |